UNITED STATES of America,
Libellant,

v.

ONE BOOK ENTITLED "THE ADVEN-
TURES OF FATHER SILAS" and One
Book Entitled "Two Novels."

UNITED STATES of America,
Libellant,

v.

TEN OBSCENE BOOKS ENTITLED
"JUSTINE" by D. A. F. DeSade et al.

United States District Court
S. D. New York.

Jan. 18, 1966.

James G. Greilsheimer, Asst. U. S. Atty. for Southern District of New York, New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Judith Nochimson, Asst. U. S. Atty.), for libellant.

Osmond K. Fraenkel, New York City, for claimant.

FRANKEL, District Judge.

In two consolidated proceedings under Section 305 of The Tariff Act of 1930, 19 U.S.C. § 1305,[1] the Government seeks "the forfeiture, confiscation, and destruction of" twelve allegedly obscene paper-backed books mailed from French publishers to the claimant, Mel Friedman, in California.[2] The quarrel began when the Collector of Customs at the Port of New York "seized and held" the books and (months later) brought them here "to await the judgment of the district court * * *." The claimant has moved for summary judgment, claiming that the First and Fifth Amendments to the Federal Constitution invalidate Section 305 on its face, or, at least, as it has been applied in the circumstances of these cases. More specifically, he contends that:

(1) The statute is unconstitutional on its face because (a) contravening A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), it provides for "seizure" of allegedly obscene books by customs officers in advance of judicial scrutiny, and (b) it allows suppression pending a judicial determination which may be excessively delayed under Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

(2) The statute has in any event been unconstitutionally applied because commencement of the libel proceedings was in fact delayed (and the books were meanwhile withheld by Customs) for periods of from

---

1. 19 U.S.C. § 1305:

"All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing * * * or other article which is obscene or immoral * * *. No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles * * * shall be subject to seizure and forfeiture as hereinafter provided * * *.

"Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of the collector. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

"In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits."

2. As the caption shows, the first libel involves two books, the second ten. On the Government's uncontested motion, the two cases were consolidated on January 4, 1966.

three to six months, contrary to Freedman v. Maryland, supra.[3]

While the parties have chosen to join issue exclusively on claimant's constitutional theses, we find it necessary only to be mindful of, but not to decide, these interesting questions. We hold that the statute, properly construed, has been violated by the long delays of the customs officers in presenting these matters for judicial decision.

### I.

As reported in the affidavits of two customs officials,[4] the pertinent and undisputed facts are these:

1. *The administrative task and procedures in general.*[5]—To enforce the prohibitions in Section 305 against importation of obscene, treasonous, and other forms of banned writings, customs officers routinely inspect printed matter arriving from overseas. Where, as in this case, books come here by parcel post, they are given by the Post Office to customs representatives for the handling of this examination. The job is a large one. While exact figures have not been given us, we are told, and can obviously know, that the "number of articles which arrive in the Port of New York annually number in the thousands." Of the total books imported at New York in 1964, 620 were seized under Section 305. For the period January through October, 1965, the corresponding figure was 86.

In some respects the procedures followed by Customs in handling this assignment are designed both to promote speed and to favor admissibility. It takes an average of three days from arrival for a book to be referred to a customs representative for initial examination. If this representative finds no violation of the obscenity provisions, the book is released for delivery on his unreviewed determination. Review of this first judgment occurs only if the representative believes that a book may violate Section 305. In such a case the book goes, within a matter of hours, to the Division of Imports Control, where it is "given a screening" by an Administrative Aide. If the book emerges from this screening without being found obscene, the favorable judgment is, again, final, and release to the addressee follows.

The reviewers at this second stage are supplied with records of earlier decisions of the Bureau of Customs in Washington. Normally, where a book has previously been held obscene, the precedent is followed. In the case of a book not previously reviewed, a reviewer reads and reports upon it, with a recommendation, for the judgment of the Administrative Aide. The reading and reporting generally require from one to three days.

Where the Administrative Aide concludes, on precedent or *de novo*, that a book is within the prohibitions of Section 305, the addressee is informed of this by letter and told that he may request an administrative review, petition for release of the detained material, or consent to forfeiture. If no response is

---

3. In his reply brief claimant makes two further points: (1) that proceedings are brought in the district of seizure (here, the Southern District of New York), imposing burdens offensive to the First Amendment when the claimant-addressee lives in a distant place (California in this instance), and (2) that he has been required to post bonds of $250 in each case, further and impermissibly hobbling the pursuit of First Amendment rights.

4. Eleanor M. Suske, Supervisory Administrative Aide in charge of the Prohibited Imports Section, Division of Imports Control, Office of the Collector of Customs for the Port of New York, and Irving Fishman, Assistant Deputy Commissioner of Customs in charge of the Restricted Merchandise Section of the Bureau of Customs, Washington, D.C.

5. The Government has chosen to describe the general procedures by affidavits, without citing or referring to the published regulations of the Bureau of Customs. See 19 CFR §§ 9.12(d), 12.40. We find no pertinent divergence, however, between the description given us and that outlined by the regulations. In fact, the affidavits present a somewhat fuller account than the one we could construct from the regulations. But see footnote 7, infra.

received within " a reasonable period,"[6] the case is sent to the Solicitor for the Port of New York for referral to the United States Attorney and the bringing of a proceeding under Section 305. If the addressee requests an administrative review, the book is sent for this purpose to the Bureau in Washington; there, again, it may either be released or detained for a judicial determination under Section 305.[7] In the course of these examinations in Washington (which sometimes include reconsideration of prior judgments on specific books in light of new court decisions), officials of the Customs Bureau occasionally consult with colleagues in the Treasury or other government agencies.

2. *Proceedings in the instant cases.*— The two books giving rise to the first of our two cases arrived in New York on February 9, 1965. "Since a prior determination had been made that each book was within the prohibition of Section 305 of the Tariff Act, there was no necessity for the preparation of a reviewer's report (or a reading of the book anew)."[8]

Notwithstanding the apparent simplicity of the problem from the administrative view, over three months then elapsed (to May 18, 1965) before the Government filed its libel seeking judicial condemnation of the books.

On the day of the books' arrival, Miss Suske sent the claimant a form letter advising him that the books had been "seized" for violation of Section 305. The letter pointed out that the addressee's consent to forfeiture would be the easiest course for him, whereas his disagreement with the Customs judgment would be considered meaningful only if he adduced "evidence" he might deem "pertinent to support [his] claim." It read in substantial and pertinent part as follows:

> " * * * If you have any reason to question the decision of this office that the above material is in violation of this provision of law, you may, of course, state your objections in writing or address a petition for the release of the material supported by such evidence as you deem is pertinent to support your claim. Merely unsupported statements or allegations will not be considered. Upon receipt of such a request, the detention will be given an administrative review. Should you thereafter be dissatisfied with this

---

6. The reference to "a reasonable period" is said in the affidavit (par. 7) of Eleanor M. Suske, the Administrative Aide, to describe the practice in existence at the time that concerns us. She adds in a footnote that the "present practice is to wait approximately 15 days for a response."

7. The affidavits tell us that the Government goes to court automatically after some fifteen days (or "a reasonable period") if the addressee fails to answer its letter. But nothing is said as to the usual practice when, as in the present case, the addressee demands release of the book. The prompt institution of suit would seem *a fortiori* appropriate in the latter situation. However this may be, we know that the Government actually embarked in these cases on administrative reviews lasting from approximately two to four months after the claimant demanded release of the books.

There is no provision for this time-consuming step in the published regulations. On the contrary, the regulations say that

if the importer does not consent to forfeiture or petition for remission (neither of which this claimant did), "information concerning the seizure shall be submitted to the United States attorney in accordance with the provisions of the second paragraph of section 305(a), Tariff Act of 1930, for the institution of condemnation proceedings." 19 CFR § 12.40(e); see also subsection (g). It seems arguable, therefore, that the customs officials acted unlawfully in that they violated their own governing regulations. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). Since we hold ultimately that the statute itself has been violated, and since this holding requires in any event that the procedures followed in these cases be revised, there is no need to resolve definitively this apparent question under the regulations.

8. Affidavit of Miss Suske, par. 10.

ruling, there is available to you a further judicial review when the United States Attorney institutes forfeiture proceedings looking to-ward the destruction of this merchandise.

"There is enclosed, herewith, an assent to forfeiture of the above-described merchandise. If you desire to sign this form and return it, marked for the attention of the undersigned, this will serve to expedite legal action—in which event, the prohibited merchandise will be disposed of in accordance with existing law and regulations without any further action on your part. If you do not sign this form, the seized material will, likewise, be disposed of by judicial proceedings in accordance with existing law."

The claimant retained California counsel, who on February 22, 1965, wrote to Miss Suske demanding immediate delivery of the books. The last of the three paragraphs in this letter said:

"In light of the rulings by Customs that *Tropic of Cancer* by Henry Miller, and *Sexus* by Henry Miller, are not obscene, and recent rulings by the United States Supreme Court and other competent tribunals giving broad protection to literature, I cannot believe that the books referred to are obscene. Accordingly, consent to destroy the books is denied. Demand is made upon you for the immediate delivery of the said books to my client."

But the books were neither delivered at this point nor given to the United States Attorney for institution of court proceedings. Instead, on March 1, 1965, Miss Suske sent the books to Washington for "administrative review," advising claimant's counsel of this action in a letter dated March 2. Two months later, on May 5, the Washington office informed Miss Suske that the books were believed to be obscene and that they should be referred to the United States Attorney for libel proceedings. Claimant's counsel was notified of this determination in a May 7 letter from Miss Suske. As noted earlier, the libel was filed on May 18.

The second proceeding before the court, involving ten books, followed a similar but more protracted course. The books arrived in New York on February 19, 1965. Like the first two, these were also on the obscene list, again eliminating the need for review and a report. Another form letter (dated February 19) went to the claimant, whose counsel again (by letter of March 19) demanded delivery. Once more the books were sent to Washington, where they were studied for some three months, until July 26, 1965, before they were found to be obscene. The libel was filed on August 3, 1965.

Thus, from the dates of the books' arrival to the institution of these libels, there were delays, respectively, of approximately three and one-half and five and one-half months. Deducting the time it took for claimant to retain counsel and demand delivery, these periods become about three months in the first case and over four in the second.[9]

## II.

In both cases the delays in bringing the libels were excessive, and the administrative procedure was defective. These conclusions flow, in our view, from the statute itself, as it must be construed in light of both its language and history, and from the grave constitutional doubts that would attend a different conclusion.

▪ The statute says, it will be recalled, that the collector, "[u]pon the seizure" of a book "shall transmit information thereof to the district attorney * * *, who shall institute proceedings in the district court * *." (Emphasis added.) The word "upon" is defined in the dictionary as meaning "with little or no interval after."[10]

---

9. For reasons mentioned later, this "deduction" is not especially helpful to the Government's case.

10. Webster's New International Dictionary of the English Language (2d ed., 1950).

While it is too late in the day to suppose that the dictionary gives decisive clues to the meaning of statutes, it remains vital to start with the terms Congress used. United States v. American Trucking Ass'ns., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). Here, the words alone indicate that customs officers were to go promptly to court with books they believed inadmissible. When the language is read against the background of its history, the result suggested by the text becomes a reasonably clear command.

In its present form Section 305 of the Tariff Act dates back to 1930, although predecessor statutes beginning in 1842 had, in one form and another, forbidden obscene imports.[11] The most critical aspects of the 1930 legislation for our purposes are the expressions of concern in the Senate (where the section took its present form) that (1) determinations of obscenity be made by courts rather than administrative officers and (2) such judicial rulings be sought promptly whenever customs officers proposed to ban imported writings.

For some time prior to 1930 there had been mounting concern among literate people over both the procedures and the substantive criteria by which customs authorities were determining that imported books should be confiscated for obscenity. See Paul and Schwartz, Federal Censorship: Obscenity in the Mail 41–49 (1961). As it emerged from the House, the provision which was to become Section 305 would have left proceedings for suppressing obscene books "to be covered by general provisions covering seizures and forfeitures in other customs cases." H.R.Rep.No.7, 71st Cong., 1st Sess. 160 (1929). When the section was reached on the Senate floor,

Senator Cutting of New Mexico launched the movement for change. He observed that the statute stirred weighty concerns under the First Amendment, and that the recent administrative practice had not tended to mitigate such concerns. 71 Cong.Rec. 4433 (1929). He discussed what he viewed as increasingly objectionable censorial judgments by both postal and customs authorities, citing such actions as the banning of Ovid, Sinclair Lewis, Boccaccio, Tolstoi, and others. He described a "black list" of proscribed books that had been compiled by postal and customs censors in October 1928, noting that in April 1929 "some further works were added to this terrible roll." Id. at 4434.

Other Senators joined in the attack upon administrative censorship. E.g., id. at 4434–39. A recurrent theme of the attack was the aversion to having censorship "by customs clerks and bureaucratic officials." Id. at 4437. Senator Cutting and others spoke vigorously against giving such officials "the right to decide for the American people what they may or may not have the right to read." Id. at 4452; see also 4436, 4438, 4448, 4459, 4471; 72 Cong.Rec. 5492, 5497 (1930). Those expressing this hostility to administrative censorship insisted repeatedly that the determination of obscenity should be for courts and juries. See 71 Cong.Rec. 4454, 4455, 4469 (1929); 72 Cong.Rec. 5417–23, 5497 (1930).

The continued debate on Section 305 generated a small flurry of proposed amendments, some drafted on the floor during the forensics. Of particular interest here are the efforts of Senator Walsh, which ultimately left a significant imprint on the section as it was enacted. During the session of March 17, 1930, speaking to the demand that adjudications on the legality of literature should be for courts rather than for administra-

---

11. Act of August 30, 1842, c. 270, § 28, 5 Stat. 566; Act of March 2, 1857, c. 63, 11 Stat. 168; Act of March 3, 1883, c. 121, §§ 2491–2493, 22 Stat. 489–490; Act of October 1, 1890, c. 1244, §§ 11– 13, 26 Stat. 614–615; Act of August 27, 1894, c. 349, §§ 10–12, 28 Stat. 549; Act of August 5, 1909, c. 6, §§ 9–11, 36 Stat. 86.

tors, Senator Pittman said (72 Cong.Rec. 5420):

> " * * * Why would it not protect the public entirely if we were to provide for the seizure as now provided and that the property should be held by the officer seizing, and that he should *immediately* report to the nearest United States district attorney having authority under the law to proceed to confiscate, and an action be brought by the United States attorney, based upon that report, to confiscate the property?" (Emphasis added.)

The suggestion drew an immediate response from Senator Walsh, who offered an amendment he described as having been drafted "hurriedly" on the floor. Id. at 5421, 5422. The proposed amendment, designed as an addition to Section 305 as it was then pending, read (id. at 5421):

> "Any person who shall import any book or other matter the entry of which is herein prohibited shall be punished by imprisonment of not more than two years or by fine of not more than $1,000 or by both such fine and imprisonment. Upon the appearance of any such book or other matter at any customs office the collector thereof shall *immediately* transmit information thereof to the district attorney of the district in which such port is situated, who shall *immediately* institute proceedings in the district court for the

forfeiture and destruction of the same, the book or other matters that are attempted to be entered to be held meanwhile to await the judgment of the court." (Emphasis added.)

Commenting favorably on this proposal, Senator Swanson emphasized his understanding that when books were seized and held under it, the question would "be quickly submitted to the district attorney and to the court for determination." Id. at 5422. In answer to a question as to when such cases would go to court under the amendment, he said "it will be done immediately." Ibid. He reemphasized the point a few minutes later when he said:

> "The minute there is a suspicion on the part of a revenue or customs officer that a certain book is improper to be admitted into this country, he presents the matter to the district court, and there will be a prompt determination of the matter by a decision of that court." Id. at 5424.

During the discussion of Senator Walsh's effort, Senator Bratton urged that the proposed amendment contain a provision for jury trial. Id. at 5423. To meet this and other suggestions, Senator Walsh rewrote his proposal to take substantially the form it ultimately had in the statute (except that the initial provision for criminal penalties was deleted before passage). Id. at 5424.[12] It will be noted that this hurried redraft omitted the word "immediately" which had

---

12. The revised version said:

> "Any person who shall import any book or other matter the entry of which is by this section prohibited shall be punished by a fine of not more than $5,000 or by imprisonment at hard labor for not more than 10 years or both.
>
> "Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is sit-

uated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed.

> "In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits."

appeared in Senator Walsh's first version. There is nothing in the debates, however, to suggest that the omission of the word was intended to change the original conception of the amendment. The prior emphasis upon the relatively ministerial role of the customs officials, and the paramount desire for judicial scrutiny, remained undiluted. There was never a suggestion of an intention to allow anything less than a prompt reference for court adjudication.

When, on the following day, the Senate passed Section 305, with Senator Walsh's revised contribution, Senator Black (as he then was) expressed his understanding as one of those who had led the fight for judicial rather than administrative determinations. He said (id. at 5517):

> "Under the procedure now proposed the matter is referred to the court for action. The book is seized, and a report is made to the district attorney for a charge to be preferred in court, and there can be a trial by jury. * * *

> "* * * [U]nder this amendment, as now framed, instead of having books censored by a clerk in the Treasury Department, that clerk merely passes upon the question as a deputy sheriff does in other cases of the violation of the law, and a proceeding is then instituted before a legal tribunal where the man who owns the book has the right to have a trial by jury."

Senator Shortridge expressed a similar understanding in colloquy with Senator Black. Id. at 5518. Similarly, Senator Bratton observed that under the amended section, "when the collector seizes [books] he shall certify the question to the United States attorney." Id. at 5518, 5519.

If this background were all we had, it might well be sufficient in itself to require a conclusion that Congress expected customs officers to move speedily for the commencement of judicial proceedings to determine whether books questioned at the port of entry should be condemned as obscene. The debates leave no room for supposing that administrative officers were empowered to suppress and study imported literature for long weeks or months before submitting the problem to authoritative tribunals.

We are encouraged in this conclusion by the Government's own submission. Disputing claimant's contention that the statute should be invalidated on its face, the Government's Memorandum says (p. 12):

> "* * * [N]othing in the statute precludes a 'prompt judicial determination.' The statute insures this by its mandate to the Collector to refer obscene materials to the Court without delay."

The Government follows a safe and seemingly required course—marked not only by the statute itself but by the First Amendment as it was expounded in Freedman v. State of Maryland, supra —when it discerns a mandate in the statute for reference to the court "without delay." While Freedman dealt with a state statute and movie censorship, it states basic First Amendment principles obviously applicable here.[13]

---

13. There have been occasional intimations that movies may be more exposed to the administrative censor than books. See Freedman v. State of Maryland, supra, 380 U.S. at 60–61, 85 S.Ct. 734, 13 L.Ed. 2d 649; Times Film Corp. v. City of Chicago, 365 U.S. 43, 49–50, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961); Joseph Burstyn, Inc., v. Wilson, 343 U.S. 495, 501–503, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). There may, on the other hand, be economic or other reasons for arguing that delayed distribution of motion pictures inflicts more serious harm than delayed sale or delivery of books. Cf. Emerson, The Doctrine of Prior Restraint, 20 Law and Contemp.Prob. 648, 669 (1955). In the end, however, it is surely no less clear for the written word than for other forms of expression that "limitation is the exception; it is to be closely confined so as to preclude what may fairly be deemed licensing or censorship." Kingsley Books, Inc., v. Brown, 354 U.S. 436, 441, 77 S.Ct. 1325, 1328, 1 L.Ed.2d 1469 (1957).

■ Thus, to go no farther back than that unanimous decision, our approach to the statute is both lighted and confined by at least these constitutional precepts:

(1) That we start with a "heavy presumption" against "[a]ny system of prior restraints of expression * * *." 380 U.S. at 57, 85 S.Ct. at 738, quoting Bantam Books, Inc., v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

(2) That the narrowly straitened area in which such prior restraints may operate excludes controls by which "it is made unduly onerous, by reason of delay or otherwise, to seek judicial review * * *." 380 U.S. at 58, 85 S.Ct. at 738.

(3) That any system of censorship must give assurance, "by stat-ute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain" the questioned material. Id. at 58–59, 85 S.Ct. at 739.[14]

(4) That "[a]ny restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." Id. at 59, 85 S.Ct. at 739.

■ If the Tariff Act and its history left our course of decision less clear than we think it is, these admonitions would make substantially certain our duty to invalidate the actions of the customs officers in these cases.[15] The delay of months in each case is far beyond the

14. The Government observes in its Memorandum opposing summary judgment (pp. 9, 13) that the Bureau of Customs "does not have censorial powers" and "has no licensing powers." The latter point is literally correct, of course, but without constitutional significance. As to the former, it is true that the word "censor" rings pejoratively in American ears (and it is not all bad that this should remain so), but the characterization seems a fair one, nevertheless, to be borne by the responsible customs officials along with the other burdens entailed by their statutory duties. Cf. Paul and Schwartz, Federal Censorship: Obscenity in the Mail at x (1961). The term is not meant to depreciate them or their earnest efforts to discharge their obligations. Nor is it meant to attach to any individual today any of the pungent sentiments showered upon "customs clerks" during the Senate debates on the 1930 legislation. It is merely to recognize that their job of "screening," and then admitting or blocking, books is forsooth "censorship" in the literal and, more importantly, in the constitutional sense.

15. This undoubtedly approaches, nearly to the point of arrival, acceptance of claimant's assertion that the statute has been unconstitutionally applied. Cf. Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). Still, it remains more than a technicality to refrain from square holdings on the Constitution when they are not indispensable. It bears reemphasis, therefore, that our holding is rested upon interpretation of the statute, though it is surely buttressed by the canon that statutes should be construed to avoid constitutional doubts. United States v. Harriss, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954); United States v. C. I. O., 335 U.S. 106, 121–123, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). It should be noted that two Judges of this Court, in a case involving an imported motion picture, have recently upheld Section 305 against claims of unconstitutionality both on the face of the statute and as it was applied. United States v. One Carton Positive Motion Picture Film Entitled "491," D.C., 248 F.Supp. 373 (Aug. 5, 1965, McLean, J., denying motion for summary judgment); id., 247 F.Supp. 450 (Nov. 17, 1965, Graven, J., after trial). But see United States v. 18 Packages of Magazines, 238 F.Supp. 846 (N.D.Calif. 1964). In the "491" case, the film arrived in New York in October 1964 and was not formally "seized" and libelled until April 1965. It appeared, however, that the intervening time was used largely for negotiations between Customs and the importer, including a period during which the latter sent the film back abroad for deletion of an assertedly objectionable sequence. While both Judges observed that the delay appeared "unusually long," they found it to have been mainly occasioned by the importer. The instant cases may be sufficiently distinguishable for present purposes in that respect alone.

period of days, or short weeks at most, that Congress must be deemed to have intended when it required action to commence court proceedings "[u]pon the seizure" of a book for supposed obscenity. Moreover, the explanation for the delay and the handling of notice to the claimant both reflect misguided and impermissible conceptions of the administrative role.[16]

We are told by the customs authorities that their task had to be lengthy because they found it "necessary to carefully evaluate the literary and social merit of each book." Furthermore, they say, they "consulted with representatives of other government agencies with respect to these books."[17] Similarly, the Assistant United States Attorney, in his affidavit (par. 9), refers to "the delicate nature of the [administrative] task of considering whether a given book is obscene. * * *" These expressions reflect unquestionably commendable efforts to proceed fairly and carefully with a difficult assignment. However, they cannot justify either the time it took or the mode of its accomplishment.

The customs officers appear to have misconceived their job. Congress gave to the courts and juries, not to them, the assertedly "delicate" role of finally determining obscenity. The customs people were to select the questionable books and refer them for this purpose. They were not to spend weeks and months weighing, measuring, and consulting over the problem.

Well, then, the Government asks, are its people simply to skim through books and deliver them to court whenever there could conceivably be a showing of obscenity? There are answers to this admittedly somewhat alarming question. In the first place, we seem to have arrived by now at an approximate definition that limits obscenity to hard-core pornography, characterized by "patent offensiveness" and devoid of "any redeeming social importance." See United States v. Klaw, 350 F.2d 155, 164, 168, and passim. (2d Cir. 1965). Juries taken at random from the population are supposed to be able in the span of a trial to detect these qualities for criminal as well as civil purposes. It should not be impossible for a customs officer to know these "patent" qualities when he sees them for some hours rather than weeks or months. Cf. Mr. Justice Stewart, concurring in Jacobellis v. State of Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12

16. It should be recalled that Freedman v. State of Maryland requires "a prompt final *judicial* decision" (380 U.S. at 59, 85 S.Ct. 734; emphasis added) as well as speedy preliminaries by the administrators (see, also, Bantam Books Inc., v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631 (1963)), and these cases have been here for some months. However, the claimant does not, and the Government could not, make anything of this delay on the present motion. Much of the time heretofore consumed in this Court followed from the Government's service of, and claimant's objections to, sets of 62 interrogatories in one case and 21 in the other. The inquiries ranged from claimant's addresses and places of business for the past ten years through claimant's prior purchases (in detail) from the foreign publishers, to claimant's views of the literary, social, and other values of the books in question. Claimant's objections to the smaller set (his objections to the others are being negotiated by counsel as this is written) were that the interrogatories called for irrelevant information, for opinion, and, in two instances, for privileged matter. Ruling only on those objections, the Court sustained all but two of the interrogatories, and there is obviously no occasion to reconsider that ruling here.

With the more plenary subject before us now, however, it seems pertinent to question the Government's practice. If, as the law demands, adjudication is to be really fast in these cases (cf. Kingsley Books, Inc., v. Brown, 354 U.S. 436, 77 S.Ct. 1325 (1957)), and since the issue should normally be only that of obscenity, it is difficult to justify such far-ranging and time-consuming inquiries. The books may not speak sufficiently for themselves on the question of obscenity (United States v. Klaw, 350 F.2d 155 (2d Cir. 1965)), but the Government ought to stand ready to prove them obscene when it seizes them.

17. Affidavit of Mr. Fishman, par. 5.

L.Ed.2d 793 (1964). Indeed, there is instruction on the point in these very cases. The United States Attorney, evidently regarding his office as more than a ministerial conduit, had the books read after receiving them from Customs. It took a week from receipt in the first case (two books) and five days in the second case (ten books) to make determinations and prepare the libels.[18]

We do not urge, nor should we countenance, irresponsible administrative judgments. We conclude only that faithful performance of the duty enjoined upon Customs by the statute should require nothing like the protracted delays in these cases.

It may not be amiss to suggest that if months of study are really used and required, this serves in itself to raise questions about the administrative judgment. If a book is that doubtful, ought it to be seized and libelled as obscene?[19] Or should doubts of this nature be resolved in favor of free expression? Cf. Craig v. Harney, 331 U.S. 367, 373, 67 S.Ct. 1249, 91 L.Ed.2d 1546 (1947); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 73, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (Douglas, J., concurring).[20]

■ Bearing in mind that we deal with controls by the Federal Government, which may be thought to be less than primarily concerned with sexual morality (see Roth v. United States, 354 U.S. 476, 504, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Harlan, J., concurring in *Alberts* dissenting in *Roth*)), there is at least some ground for an affirmative answer to this rhetorical question. If books are blocked by Customs, they are banned for all the people, with all the diversities of taste and judgment that enliven fifty states.[21] If a possibly obscene book slips through, it faces a gauntlet of universal state obscenity laws.[22] To be sure, the First Amendment has not been held to inhibit state power less strictly than federal. See Roth v. United States, 354 U.S. 476, 492 n. 31, 77 S.Ct. 1304 (1957); Jacobellis v. State of Ohio, 378 U.S. 184, 187, n. 2, 84 S.Ct. 1676 (1964). It does not follow, conversely, that the "risks" of free expression should not occasionally, as a practical matter, be more readily tolerated by the Federal Government. Cf. United States v. Associated Press, 52 F.Supp. 362, 372 (S.D.N.Y.1943), affirmed, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

18. Affidavit of Assistant United States Attorney Greilsheimer, pars. 4, 5.

19. This is not to suggest any substantive judgments on the particular books involved here. For purposes of the conclusion we reach, they may be assumed *arguendo* to be obscene. We have concluded, not unwillingly, that there is no occasion now to read the books and determine that question.

20. Administrators, not less than legislators and judges, are under the First Amendment. Customs officers should be continuously aware that the burden of proving obscenity is upon them. Freedman v. State of Maryland, supra 380 U.S. at 58, 85 S.Ct. 734, 13 L.Ed.2d 649. They should obviously be sensitive to the First Amendment's presumption in favor of free expression when they encounter materials that leave them in doubt on this question. Further, while the test of *"clear and present danger"* has had its normal application in other contexts (see Brennan, The Supreme Court and the Meikle-

john Interpretation of the First Amendment, 79 Harv.L.Rev. 1, 8, 11 (1965)), its echoes may still deserve the attention of censorship officials.

21. Compare the observations of Senators Black and Cutting in the 1929 and 1930 debates urging their preference that controls of obscenity be left to the several States. 71 Cong.Rec. 4451, 4469 (1929); 72 Cong.Rec. 5419, 5497, 5498 (1930).

22. See Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304 (1957). The *Roth* opinion (p. 485, 77 S.Ct. p. 1309) noted that laws in all 48 of the then-existing states and an agreement among over 50 nations reflected "the universal judgment that obscenity should be restrained * * *." Alaska and Hawaii, illustrating the wide climatic and ethnic range embraced by the animus against obscenity, bring today's unanimous total of states to 50. See Alaska Comp.Laws Ann. §§ 65-9-11a to 65-9-11d (Supp.1958); Hawaii Rev. Laws §§ 267-8 to 267-10, 302-1 and 302-2 (1955).

Returning to the administrative exigencies on which the Government seeks to justify the delays in these cases, we find a curious and revealing statement in both affidavits filed here by customs officials:

"The delay in both actions between the arrival of the books at the Port of New York and the transmission of the books to the United States Attorney for the institution of forfeiture proceedings was occasioned by the claimant's assertion that the books were not obscene which necessitated an additional review of each book by the Bureau of Customs in Washington." [23]

This notion—that life would be simple if people merely bowed to the Customs judgment, and that substantial delay is justifiable when they do not—tends to pervade the administrative practice. It is patently wrong. Its correction should go far to bring Customs into compliance with its statutory duties.

Taking the view it states here, Customs (at least as reflected in these cases) has followed the practice of sending a notice to the addressee and then doing nothing while it awaits a response. Only if the addressee refuses to surrender does Customs proceed to the further study it considers necessary as a prelude to court proceedings. It might be said parenthetically that since many addressees undoubtedly give up at the outset rather than face expensive litigation for a book or two,[24] the practice of sending a forfeiture notice before making a judgment on which the agency will stand is in itself open to serious question. But even accepting that practice for now, it is not possible to justify the system of inaction until the addressee responds. Here, concretely, the agency permitted two weeks of such inaction in one case and a month in the other. Periods like these should supply the allowable maxi-

mum time Customs may need for the study it deems necessary either to conclude that judicial proceedings are warranted or to send a letter of apology and explanation (with the books) to the addressee.

This means no doubt that time will be spent studying books in cases where the addressee later chooses not to fight confiscation. With genuine deference to the harried schedules of some government officials, this is scarcely an excessive price to pay for compliance with the statute and the Constitution.

■ The apparent premise, or hope, of the officials that their judgments of obscenity will simply be accepted by intended recipients of books tends in another respect to infect their dealings with potential claimants. The first letter of notification, quoted earlier in this opinion, invites the addressee, if he is minded to object, to produce "evidence * * * to support [his] claim." It goes on to pronounce that "[m]erely unsupported statements or allegations will not be considered." It tells him, finally, that if he signs "an assent to forfeiture * *, this will serve to expedite legal action. * * *" At least the first two quoted statements are misleading and inconsistent with the statute. Apart from the difficulty of knowing what sort of "evidence" the agency would want at this point, there is no justification for its suggesting the need to produce any at all. Contrary to what the officers write, it is enough for the addressee to interpose an "unsupported" claim that the book is not obscene and should be delivered to him. It then becomes the burden of the Government, if it chooses, to plead and prove its charge of obscenity. Cf. Freedman v. State of Maryland, supra, 380 U.S. at 58, 85 S.Ct. 734; Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).[25]

23. Miss Suske's affidavit, par. 26. Mr. Fishman makes the same point in paragraph 5 of his affidavit.

24. Cf. 71 Cong.Rec. 4437, 4438 (1929).

25. The further advice that "an assent to forfeiture * * * will serve to expedite legal action" is literally correct. The same is true generally of guilty pleas and consent judgments. Since "expedit-

In sum, we hold that the long delays alone, though aggravated by the solecisms just noted, invalidate the seizure in these cases. We have spoken earlier of a "period of days, or short weeks at most," as marking the permissible postponement of court proceedings under the statute. This is less than a neatly finite prescription. It would seem inappropriate and unhelpful, however, for a court to undertake "to lay down rigid time limits or procedures" (Freedman v. State of Maryland, supra, 380 U.S. at 61, 85 S.Ct. at 740). Leaving for another day the question of how long a delay might not be too long, it is sufficient to say that the officers took far too long in these cases.[26]

## III.

Having concluded that the Government suppressed the books for an unlawfully protracted time, we hold that they must be released to the claimant forthwith. Such a remedy is the only acceptable one to cure the wrong even though we go on the assumption that the books are indeed obscene. Cf. A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 208, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrants of Property, 367 U.S. 717, 723, n. 9, 738, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). This would seem to hold in any case, but it is comforting and permissible to believe that twelve obscene books, if they are obscene, delivered to a claimant in California threaten only a minimal instance of the evil against which Congress legislated.

ing" is commonly thought to be a good thing, it may be questioned whether the Government orders the relevant values acceptably when it gives subtle encouragement to such acquiescence.

26. The state enactment fell in Freedman v. State of Maryland because there was no assurance, "by statute or authoritative judicial construction," that the censor's delay would be confined to a "specified brief period. * * *" 380

Claimant's motion for summary judgment will be granted, dismissing the libels and ordering the books released and delivered to him.

Settle order on three days' notice.

U.S. at 58–59, 85 S.Ct. at 739. We deal here with a federal statute, with authority to construe and a duty to preserve if possible. Cf. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953). Accordingly, the absence from the statute of a "specified brief period" is a gap suitably supplied by federal judicial construction, however "authoritative" the present interpretation may eventually come to be.