UNITED STATES of America, Plaintiff,

v.

VARIOUS ARTICLES OF OBSCENE MERCHANDISE, SCHEDULE NO. 1303, Defendant.

No. 75 Civ. 4691.

United States District Court,
S. D. New York.

Aug. 25, 1976.

Bruce A. Long, pro se; Steven S. Raab, Lancaster, Pa., of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for plaintiff William R. Bronner, Asst. U. S. Atty., New York City.

## OPINION

FRANKEL, District Judge.

For 135 years, Congress has forbidden penetration of our shores by obscene materials.[1] The enactment currently performing that protective function is § 305 of the Tariff Act of 1930, 19 U.S.C. § 1305(a) (1970).[2] Customs personnel at our various

---

1. Statutes dating back to 1842 have, in one form or another, forbidden obscene imports. See, e. g., Act of August 30, 1842, c. 270, § 28, 5 Stat. 566; Act of March 3, 1883, c. 121, §§ 2491–2493, 22 Stat. 489–490.

2. 19 U.S.C. § 1305(a) provides in pertinent part:

"All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, * * * or other article which is obscene or immoral * * *. No such articles whether imported separately or contained in packages

ports staff this bulwark. They spend their time opening mail and packages, having evidently learned what to suspect. Materials believed to be of the forbidden kind are turned over to the United States Attorney for the district in which the port lies.

In this district, the Customs Service makes a weekly bundle of the allegedly obscene items, which are then listed on a schedule and proceeded against by the United States Attorney's complaint *in rem*. The addressees receive notice that their mail has been opened and potentially condemned, and that they are entitled to claim it. Most ignore the notices, and their things are consigned by default to be destroyed.

If a claim is filed, it is set down to be "heard." On the day noticed for the hearing, a judge of the court turns up to preside. There is present an Assistant United States Attorney, an expert from Customs just in case, and usually no one else. (In over 10 years on this court, this incumbent has seen two exceptions before the instant case.)[3] With nobody present to quarrel, the judge solemnly inspects the "claimed" postal cards, photos, brochures, and the like, intones a finding, *inter alia*, that each "work, taken as a whole, appeals to the prurient interest," *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), and sustains the Government's complaint.

In the extraordinary case now before the court, for reasons that may include at least some suited to our Bicentennial Year, the 29-year-old claimant hied himself here from Lancaster, Pennsylvania, on the appointed day and demanded delivery of the magazine intercepted on its way to him from a friend in Germany. Appearing *pro se* and waiving a jury, he presented the few undisputed facts which are now found·to raise issues of some consequence. At the court's suggestion, he thereafter procured some assistance from an attorney in Lancaster for the writing of a brief. The proceedings became prolonged, mostly because of delays incurred in plaintiff's and the court's work, government counsel having been diligent, prompt, and helpful throughout. Because both sides were interested in a reasonably deliberate decision, the usual requirement of speed in such matters was waived.[4]

## I

Claimant attacks at the threshold the opening by Customs agents of his "first-class mail"[5] without prior judicial approval.

with other goods entitled to entry, shall be admitted to entry; and all such articles and, unless it appears to the satisfaction of the appropriate customs officer that the obscene or other prohibited articles * * * were inclosed therein without the knowledge or consent of the importer * * *, the entire contents of the package * * * shall be subject to seizure and forfeiture * * *.

"Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the appropriate customs officer to await the judgment of the district court as hereinafter provided * * *. Upon the seizure of such book or matter such customs officer shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed * * *."

3. Like today's case, the two prior instances of actual contest posed substantial issues of constitutional law. *United States v. One Book Entitled "The Adventures of Father Silas,"* 249 F.Supp. 911 (S.D.N.Y.1966); *United States v. Articles of "Obscene" Merchandise*, 315 F.Supp. 191 (S.D.N.Y.) (three-judge court), appeal dismissed, 400 U.S. 935, 91 S.Ct. 246, 27 L.Ed.2d 241 (1970), 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971).

4. In *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 367, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), the Supreme Court held that forfeiture proceedings under 19 U.S.C. § 1305(a) must be commenced within 14 days of seizure and a judicial determination made within 60 days thereafter.

5. The quoted characterization of the magazine has been used by the claimant and not disputed. Whether it is literally accurate as a matter of postal lore is not significant here.

Government counsel duly informs us that the Court of Appeals for the District of Columbia Circuit has lately issued a powerful opinion, though over a dissent, outlawing warrantless searches by Customs agents of letter-class mail arriving from abroad. *United States v. Ramsey*, 176 U.S.App.D.C. 67, 538 F.2d 415 (1976). As that Court observes, especially tellingly in the climate of our times, the values of both the First and the Fourth Amendments are implicated in troublesome fashion by the unchecked practice of border agents in opening letters as well as packages mailed here from overseas.

On the other hand, until that recent decision, a substantial body of federal authority stood for a contrary view. The courts considering the issue had held that the standard, if it could be called that, for opening foreign mail is that of a border search. See, e. g., *United States v. Doe*, 472 F.2d 982 (2d Cir.), *cert. denied*, 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973); *United States v. Beckley*, 335 F.2d 86 (6th Cir. 1964), *cert. denied*, 380 U.S. 922, 85 S.Ct. 921, 13 L.Ed.2d 807 (1965); *Hogan v. Nebraska*, 402 F.Supp. 812 (D.Neb.1975); *United States v. Various Articles of Obscene Merchandise, Schedule No. 896*, 363 F.Supp. 165 (S.D.N.Y.1973). That view has been applied to letters coming from abroad. *United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975); *United States v. Barclift*, 514 F.2d 1073 (9th Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 63 (1975). Although our Circuit has not specifically applied this holding to letter-class foreign mail, there has been dictum at the Circuit level and a holding of this court in line with the weight of precedent. See *United States v. Doe, supra*, at 984–985; *United States v. Swede*, 326 F.Supp. 533 (S.D.N.Y.1971).

The broad question may be destined for resolution soon by the Supreme Court; the Government is seeking certiorari in *United States v. Ramsey, supra*. As with other issues in the instant case, the claimant's limited resources have afforded less than the intensive briefing the court would desire on this one. Our factual record is sketchy and far from ideal. This court is

not prepared, in all candor, to add to the pertinent learning in the decisions of higher courts. In the circumstances, and since the claimant is hereinafter held to prevail on the more central and specific questions of this case relating to the receipt of allegedly obscene materials, the general propriety of opening letter-class mail from abroad may be bypassed at this level for present purposes.

## II.

We come to the question of the applicable standard for determining obscenity, and whether the Government has sustained its burden of proof in this aspect.

■ In a forfeiture proceeding under 19 U.S.C. § 1305(a), it is the Government's burden to prove by a preponderance of the evidence that the detained material is obscene. See *United States v. One Reel of 35mm Color Motion Picture Film Entitled "Sinderella," Sherpix, Inc.*, 369 F.Supp. 1082, 1084 (E.D.N.Y.1972), *aff'd*, 491 F.2d 956 (2d Cir. 1974); *United States v. One Carton Positive Motion Picture Film Entitled "Technique of Physical Love,"* 314 F.Supp. 1334, 1335 (E.D.La.1970). While that burden remains undischarged, the matter is presumptively embraced by the First Amendment. Before deciding whether the Government has satisfied its burden here, two threshold issues must be resolved: (A) which community's standards are to be applied in making the obscenity determination, and (B) if the applicable standards are not those prevailing in this judicial district, whether this court or a jury drawn from this district should make the requisite finding.

### A. *Applicable Community Standard*

■ The claimant, among his other interesting attributes, was once a member of the Lancaster Mayor's Committee on Community Standards on Pornography. Whatever New Yorkers may prefer to believe, secretly or otherwise, he presented substantial (and uncontradicted) evidence that the community standard defining obscenity in

Lancaster is far more stringent, i. e., libertarian, than that in New York. Under Lancaster's standards, it seems that nothing is to be outlawed as obscene that is (1) viewed by an adult in private and (2) not offered or purveyed to children.[6] Thus, while this court—bound in time and place and person—might conclude that no American jury could find the material in question other than obscene, that is scarcely a permissible mode of disposition under the precedents. The question of obscenity *vel non*, once the constitutional threshold is passed,[7] is one of fact, to be answered by local community standards.[8] See *Miller v. California*, 413 U.S. 15, 30, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Jenkins v. Georgia*, 418 U.S. 153, 159, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974). The diverse and far-flung communities of the United States may set standards within constitutional limits for defining obscenity. But they are free to be less inhibited and inhibiting than the Constitution would allow. See, e. g., *Paris Adult Theatre I v. Slaton, supra*, 413 U.S. at 64, 93 S.Ct. 2628; *Roth v. United States*, 354 U.S. 476, 505–06, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Harlan, J., dissenting).

Although *Miller* and its progeny make local standards controlling, they do not tell us which community's standards are to be applied. See, e. g., *United States v. Friedman*, 488 F.2d 1141 (10th Cir. 1973); Schauer, *Obscenity and Conflict of Laws*, 77 W.Va.L.Rev. 377 (1975); Comment, *Government Seizures of Imported Obscene Matter: Section 305 of the Tariff Act of 1930 and Recent Supreme Court Obscenity Decisions*, 13 Colum.J. of Trans.L. 114 (1974). We do know that they may not be national standards, even when a federal statute is involved. See *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). We also know that juries may be instructed to "apply 'community standards' without specifying what 'community,'" *Jenkins v. Georgia*, 418 U.S. 153, 157, 94 S.Ct. 2750, 2753, 41 L.Ed.2d 642 (1974), or instructed more pointedly to apply a statewide or other, narrower geographical standard. *Id.* Finally, we have been told that the Constitution allows a single judge to make the community judgment, see *Alexander v. Virginia*, 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973), even though a jury "represents a cross-section of the community and has a special aptitude for reflecting the view of the average person." *McKinney v. Alabama*, 424 U.S. 669, 96 S.Ct. 1189,

---

**6.** The claimant also testified that material closely resembling his seized magazine, or even more candid materials, are available on the newsstands and bookstores in Lancaster. "[T]he availability of similar materials in the community" does not establish the nonobscenity of claimant's magazine. *Hamling v. United States*, 418 U.S. 87, 125–26, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974). However, their availability, along with the announced policies of the community, may be some evidence of pertinent attitudes in Lancaster.

**7.** At least for purposes of criminal prosecution, only materials that "depict or describe patently offensive 'hard core' sexual conduct" may be determined to be obscene. *Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974), quoting *Miller v. California*, 413 U.S. 15, 27, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Hard core sexual conduct includes "representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," and "representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id.* at 25, 93 S.Ct. at 2615. Claimant's mail falls within this category. Thus, a trier of fact, applying the rele-

vant community standards, would be permitted constitutionally, but not required, to find obscenity as a matter of fact.

**8.** Whether material can be obscene "as a matter of law" is open to dispute. Cf. *United States v. Friedman*, 528 F.2d 784, 789 (10th Cir. 1975) (obscene even under the standards of "ancient Sodom and Gomorrah"). An affirmative answer to that question would be difficult to square with the Supreme Court's insistence upon local standards, including standards opposed to "all controls * * *." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). See Note, Community Standards, Class Actions, and Obscenity under *Miller v. California*, 88 Harv.L.Rev. 1838, 1845–46 n.49 (1975). In any event, this court cannot say with the requisite certainty that a community favoring access by its adults to any material of their choosing, as claimant's community does, would find that the mail in dispute here depicts sexual conduct in a "patently offensive way" or that the "work, taken as a whole, appeals to the prurient interest."

1199, 47 L.Ed.2d 387 (1976) (Brennan, J., concurring), quoting *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 448, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (Brennan, J., dissenting). See *United States v. One Reel of 35mm Color Motion Picture Entitled "Sinderella," Sherpix, Inc.*, 491 F.2d 956, 958 (2d Cir. 1974).

 Predictably, there has been no consensus among the lower federal courts as to which community's standards *Miller* meant to tap. There is growing support for the view that a federal court may invoke the community standards of the district in which it sits and from which it draws a jury. See *United States v. Marks*, 520 F.2d 913, 919 (6th Cir. 1975), *cert. granted*, 424 U.S. 942, 96 S.Ct. 1408, 47 L.Ed.2d 347 (1976). *United States v. Various Articles of Obscene Merchandise, Schedule No. 896*, 363 F.Supp. 165, 167 (S.D.N.Y.1973); *United States v. Miscellaneous Pornographic Magazines*, 400 F.Supp. 353, 354 (N.D.Ill.1975). Cf. *United States v. One Reel of 35mm Color Motion Picture Entitled "Sinderella," Sherpix, Inc.*, *supra*, 491 F.2d at 958. It is clear, however, that evidence of community standards outside the judicial district may also be considered. See, e. g., *Hamling v. United States*, *supra*, 418 U.S. at 106, 94 S.Ct. 2887; *United States v. Marks*, *supra*, 520 F.2d at 919. Finally, there is precedent and scholarly support for the proposition that the standard should be selected according to the nature of the alleged violation. Thus, if a defendant is charged under 18 U.S.C. § 1461 with mailing allegedly obscene material into a given district, "the contemporary standards, as to obscenity * * * [should be those of] the area of the distribution of material * * *." *United States v. Elkins*, 396 F.Supp. 314, 316 (C.D.Cal.1975). See also *United States v. Slepicoff*, 524 F.2d 1244, 1249 (5th Cir.

1975); Schauer, *supra*, at 398. This latter view would seem to achieve the aim of *Miller* to allow the States to adopt varying standards as to the nature of material they will allow within their borders.

 Since the States are free to "follow * * * a 'laissez-faire' policy and drop all controls on commercialized obscenity, if that is what they prefer," *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973), and since individuals are allowed to possess even patently obscene materials in their own homes, see *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969),[9] it is anomalous to allow a few port of entry community standards to dictate what citizens of other communities may read and see. There is no federal standard of obscenity; there are only local community standards. The question is one of local morality, of variegated community attitudes; it touches aspects of thought and feeling in which free people are expected to be diverse, to experiment, and to choose for themselves. *Roth v. United States*, 354 U.S. 476, 503–506, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (Harlan, J., dissenting). The several purposes served by our customs laws are not thought to include the imposition of a "blanket ban" or a "deadening uniformity," *id.* at 506, 77 S.Ct. 1304, upon the whole Nation by allowing a happenstantial port of entry to become the arbiter of taste and decency for recipients of mail everywhere. If such an oppression were deemed to have been intended by the Congress, it would raise momentous questions under the First Amendment. But it does not appear—it is surely not necessary to conclude—that this was purposed.

9. The right to possess obscene materials in one's home does not carry with it a right to receive those materials. See *United States v. Orito*, 413 U.S. 139, 141, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); *United States v. Reidel*, 402 U.S. 351, 355, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971). But that is not the issue here. Obscenity now is only in the eye of the beholder, the "community beholder" as it were. Thus, barring mail under the standards of some "alien" community may prevent a community with freer standards from receiving materials it would not deem obscene. The latter community and its citizens do not assert a right to receive obscene materials, but rather materials they authoritatively characterize as nonobscene.

■ For reasons touched thus far, and upon related grounds to be addressed, the sensible reading of § 1305(a), avoiding constitutional doubts, is to promote and allow determinations of obscenity under the standards of the community to which the questioned mail is addressed.[10]

## B. *The Appropriate Fact-Finder*

Compelled to come to New York to demand his mail, the claimant could have demanded a jury. But it would have been a New York jury. Conceivably, it, like the court, could have tried to understand and apply the standards of Lancaster, Pennsylvania. But that would be at best a dubious enterprise. The central point of the local community standard is that it is capable of fully effective application only by a person from the community who "is entitled to draw on his own knowledge of the views of the average person in the community or vicinage * * *." *Hamling v. United States*, 418 U.S. 87, 104, 94 S.Ct. 2887, 2901, 41 L.Ed.2d 590 (1974). See also *United States v. Elkins*, 396 F.Supp. 314, 318 (C.D. Cal.1975). It contradicts the basic premise of this standard to have people from one community purport to go by the sentiments of another.

■ The test of obscenity under *Miller* is essentially a question of fact to be determined by "the average person, applying community standards." 413 U.S. at 30, 93 S.Ct. at 2618. National standards were rejected, *inter alia*, because "it would be unrealistic to require that the answer be based on some abstract formulation * * *. To require a State to structure obscenity proceedings around evidence of a *national* 'community standard' would be an exercise in futility." *Id.* The futility is more vivid if we posit, as the Supreme Court commands, uniquely felt local attitudes, and then expect these to be assimilated and applied by people from other places, with other feelings and attitudes.

■ There is no need now to doubt that the Government may discharge its burden to prove obscenity under the applicable local standards in an uncontested case by merely offering up the seized materials for inspection by "foreign" fact-finders. The case is wholly altered when, as here, a claimant comes forward with undisputed evidence that his mail would not be branded obscene by his own community. The principled solution for all concerned is to refer disputes of this nature to the district of the claimant's residence.[11] This would at the

10. This approach is in harmony with the prevailing principle in conflict of laws jurisprudence mandating that the controlling law be taken from the jurisdiction which has the most significant contacts with the allegedly wrongful act. See Schauer, *Obscenity and the Conflict of Laws,* 77 W.Va. L.Rev. 377, 397 (1975); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). For purposes of 19 U.S.C. § 1305(a), that jurisdiction is surely the recipient's community, not the port where a customs official happens to open sealed mail and expose its assertedly obscene contents. See Schauer, *supra*, at 398. To be sure, the multiple venue provisions of some of the federal obscenity statutes complicate the problem of choosing the appropriate standard or standards, especially when applied to a multi-state distributor, see *id.* at 385, but such difficulties are not acute under 19 U.S.C. § 1305(a) and, moreover, cannot be invoked to justify the application of a standard that the Constitution does not permit.

11. There is some question as to whether an *in rem* action may be transferred to another district under 28 U.S.C. § 1404(a), compare *Torres*

*v. The Rosario*, 125 F.Supp. 496 (S.D.N.Y.1954) (*in rem* action can be transferred), *mandamus denied*, 221 F.2d 319 (2d Cir.), *cert. denied*, 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 746 (1955), with *Clinton Foods v. United States*, 188 F.2d 289 (4th Cir.), *cert. denied*, 342 U.S. 825, 72 S.Ct. 45, 96 L.Ed. 624 (1951). But this is not a problem if, as this court ultimately concludes, the choice of venue must be given to the recipient of the questioned mail.

The Government suggests that transfer is impossible because Customs officials are not authorized to allow contraband to "enter" the country. But the notion of an "entry" is not so narrowly physical. Even a person may not accomplish a meaningful "entry" for purposes benefitting him because he has been allowed to cross our border. *Shaughnessy v. Mezei*, 345 U.S. 206, 213, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *United States v. Glaziou*, 402 F.2d 8, 12 (2d Cir. 1968), *cert. denied* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). On reasoning still more comfortable, a piece of mail has no more "entered" if it is held for adjudication in Lancaster than it has when it is so

same time serve the end of elementary procedural fairness, a point that merits separate treatment.

## III.

The schedule of items libeled in this case lists very few recipients who live near or in this district. Most of this mail was destined for such faraway places as Rigby, Idaho, Honolulu, Hawaii, Daisy, Tennessee, Big Spring, Texas, Newport Beach, California, and Anchorage, Alaska. The things seized are characteristically of trivial monetary value. The burden and expense of coming here to press a claim are altogether disproportionate, as is illustrated by the case of the one claimant now before the court.

 Any freedom is by definition impaired when its exercise is made costly and troublesome. The relevance of this proposition to First Amendment freedoms is familiar and obvious. See, e. g., *Freedman v. Maryland*, 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Any system of prior restraint, such as that permitted by 19 U.S.C. § 1305(a), "comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). "Because the line between unconditionally guaranteed speech and speech that may be legitimately regulated is a close one," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 561, 95 S.Ct. 1239, 1248, 43 L.Ed.2d 448 (1975), the system of restraint "cannot be administered in a manner which would lend an effect of finality to the censor's determination * * *." *Freedman v. Maryland, supra,* 380 U.S. at 58, 85 S.Ct. at 739. Without appropriate procedural "safeguards, it may prove too burdensome to seek review of the censor's determination." *Id.* at 59, 85 S.Ct. at 739. See also *Speiser v. Randall,* 357 U.S. 513, 521–526, 78 S.Ct. 1332, 2 L.Ed.2d

1460 (1958). The quoted principles have plain application here. If it needs empirical demonstration, the experience of this court (undoubtedly typical) supplies it. Almost nobody shoulders the burden of a contest when his mail is opened, kept, and placed upon one of the condemning schedules.

Again, the vice in the procedure is curable, or at least mitigated, by referring contested claims to the district of the claimant's residence, or at least giving the claimant the option of having the matter heard there.

## IV.

 This case has made vivid and concrete some problems under 19 U.S.C. § 1305(a) which do not appear, in the reported decisions of which the court is aware, to have been squarely considered before.[12] Upon the record and the legal doctrines outlined above, the procedure under the statute is found to offend against the First Amendment both in (a) depriving claimants and their local communities of the freedom to read and see things in accordance with their own standards of what is or is not obscene, and (b) failing to afford a less onerous and expensive procedure for the vindication of First Amendment claims to items seized. The invalidity of the procedure could have been eliminated, and can be in the future, by stating in the notice to potential claimants that they have a right to have the issues heard in the district of their residence or of the destination of the mail matter. Because the claimant was not given this choice, or, of course, any notice of such a choice, his claim should be sustained without reaching the merits of the issue of obscenity. See, e. g., *Southeastern Promotions, Ltd. v. Conrad, supra,* 420 U.S. at 562, 95 S.Ct. 1239; *Freedman v. Maryland, supra,* 380 U.S. at 60, 85 S.Ct. 734; *United*

detained in New York City for purposes of 19 U.S.C. § 1305(a).

**12.** Although the issue of unreasonably burdensome procedures has been presented in two cases within the court's knowledge, see *United States v. Articles of "Obscene" Merchandise,* 315 F.Supp. 191, 193 (S.D.N.Y.) (three-judge

court), appeal dismissed, 400 U.S. 935, 91 S.Ct. 246, 27 L.Ed.2d 241 (1970), 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971); *United States v. One Book Entitled "The Adventures of Father Silas,"* 249 F.Supp. 911, 913 n. 3 (S.D.N.Y.1966), it was not reached in either.

*States v. One Book Entitled "The Adventures of Father Silas,"* 249 F.Supp. 911 (1966).

Alternatively, the claimant would prevail because the Government has failed to sustain the burden of proving the material obscene within the local community standard of Lancaster, Pennsylvania.

The complaint is dismissed as against this claimant. The magazine he demands should be delivered to him within 30 days unless the Government before then files a notice of appeal, in which event, subject to the orders of the Court of Appeals, this order is stayed pending expeditious prosecution of such an appeal.

It is so ordered.