UNITED STATES of America

v.

**392 COPIES OF a MAGAZINE EN-
TITLED "EXCLUSIVE".**

UNITED STATES of America

v.

**3600 COPIES OF a MAGAZINE ENTI-
TLED "REVIEW INTERNA-
TIONAL", VOL. 6.**

UNITED STATES of America

v.

**1000 COPIES OF a MAGAZINE ENTI-
TLED "INTERNATIONAL NUDIST
SUN", VOL. 16.**

*Civ. Nos. 17080, 17065, 17066.*

United States District Court
D. Maryland.

April 4, 1966.

Thomas J. Kenney, U. S. Atty., Arthur G. Murphy and Fred K. Grant, Asst. U. S. Attys., Baltimore, Md., for plaintiff.

Robert Eugene Smith, Baltimore, Md., and Herald P. Fahringer, Buffalo, N. Y., for claimant.

THOMSEN, Chief Judge.

In these consolidated proceedings under section 305 of the Tariff Act of 1930, 19 U.S.C.A. § 1305,[1] the government seeks the forfeiture, confiscation and destruction of 392 copies of a magazine entitled Exclusive, 3600 copies of a magazine entitled Review International No. 6, and 1000 copies of a magazine entitled International Nudist Sun No. 16, imported from Denmark, on the ground that they are obscene material, the importation of which is prohibited by section 1305. Claimant contends that the material is not obscene, that section 1305 is unconstitutional on its face,[2] and that section 1305 is unconstitutional as applied in these cases.[3]

1. Section 1305 of Title 19, U.S.C.A., provides in pertinent part:

"All persons are prohibited from importing into the United States from any foreign country * * * any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, or drawing * * * or other article which is obscene or immoral, * * *. No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles * * * shall be subject to seizure and forfeiture as hereinafter provided * * *.

"Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of the collector. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

"In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits."

2. Claimant contends that section 1305 is unconstitutional because:

"(a) Its invocation in the case at bar abridges the respondent's right to freedom of speech and press under the First Amendment to the Constitution of the United States.

"(b) It empowers government officials to seize and exclude imported magazines suspected of being 'obscene' and to do so prior to any judicial determination that they are, in fact, 'obscene'.

"(c) It empowers government officials to seize and exclude imported magazines preceding an advisory determination of their 'obscenity'.

"(d) It allows suppression of reading material pending a judicial determination which may be excessively delayed."

3. Claimant contends that section 1305 is unconstitutional as applied and invoked in these cases because:

"(a) From the time of the seizure of the above entitled publications there has been no judicial scrutiny of said publications or advisory hearing to determine their character and nature.

"(b) That since the seizure of the above entitled publications an inordinate amount of time has expired wherein their distribution has been unreasonably and unconstitutionally restrained in violation of the provisions embodied in the First Amendment to the United States Constitution.

"(c) It has been unconstitutionally applied because commencement of the libel

488

*Procedure*

*Proceedings in the Case.* On February 3, 1966, two separate shipments consisting respectively of 3600 copies of Review International No. 6 and 1000 copies of International Nudist Sun No. 16, imported from Denmark and consigned to custom house brokers on behalf of claimant, Central Magazines Sales, Ltd., were brought from the ship to the Appraisers' Stores in Baltimore after the bills of lading had been delivered to Customs officials by the brokers for clearance through Customs. Entry numbers were assigned on the same day. On February 8, 392 copies of Exclusive were similarly imported and entered. The shipments were examined promptly by the line examiner to determine whether any duty was payable, and whether any of the material was inadmissible for a variety of statutory reasons, including obscenity and violation of copyright.[4] The line examiner thought that the magazines were probably obscene and referred them to the appraiser, in accordance with established procedures. The appraiser likewise felt that the material should be considered for possible forfeiture and referred the matter to the Obscene Literature Committee, a group of Customs officials in Baltimore, again in accordance with established procedures.

Thereafter, if the Committee also believed the material to be obscene, it would ordinarily have been seized or detained[5] pending further administrative proceedings under 19 C.F.R. § 12.40[6] before it was referred to the United States Attorney for the institution of forfeiture proceedings. The administrative proceedings in Baltimore would ordinarily not have been significantly different from those described under the heading "The administrative task and procedures in general", in United States v. One Book entitled "The Adventures of Father Silas", et al., S.D.N.Y., 249 F.Supp. 911,

---

proceedings was delayed for an inordinate amount of time and further the libel proceedings have been delayed unreasonably."

4. See note 13, infra.

5. See discussion in United States v. One Carton Positive Motion Picture Film, S.D. N.Y., 248 F.Supp. 373, 376 (1965), quoted in note 15 below. See also United States v. One Book Entitled "The Adventures of Father Silas", et al., S.D.N.Y., 249 F. Supp. 911, 913–14 (1966) ; United States v. 18 Packages of Magazines, N.D.Cal., 227 F.Supp. 198, 206, 208 (1963).

6. The pertinent portions of 19 C.F.R. 12.40 read as follows:
 "* * * *
 "(b) Upon the seizure of articles or matter prohibited entry by section 305, Tariff Act of 1930 (with the exception of the matter described in paragraph (a) of this section), a notice of the seizure of such articles or matter shall be sent to the consignee or addressee.
 "(c) When articles of the class covered by paragraph (b) of this section are of small value and no criminal intent is apparent, a blank assent to forfeiture, customs Form 4609, shall be sent with the notice of seizure. Upon receipt of the assent to forfeiture duly executed, the articles shall be destroyed if not needed for official use and the case closed.

"* * * *
"(e) If the importer declines to execute as an assent to forfeiture of the articles other than those mentioned in paragraph (a) of this section and fails to submit, within 30 days after being notified of his privilege so to do, a petition under section 618, Tariff Act of 1930, for the remission of the forfeiture and permission to export the seized merchandise, information concerning the seizure shall be submitted to the United States attorney in accordance with the provisions of the second paragraph of section 305(a), Tariff Act of 1930, for the institution of condemnation proceedings.
 "* * * *
 "(g) In any case when a book is seized as being obscene and the importer declines to execute an assent to forfeiture on the ground that the book is a classic, or of recognized and established literary or scientific merit, a petition addressed to the Secretary of the Treasury with evidence to support the claim may be filed by the importer for release of the book. Mere unsupported statements or allegations will not be considered. If the ruling is favorable, release of such book shall be made only to the ultimate consignee.
 "* * * *"

at 913 (January 18, 1966). In that case Judge Frankel held the facts, set out at pp. 914–915, showed that the government had suppressed the books for an unlawfully protracted time. However, as a result of that decision and of other recent decisions,[7] a meeting was held in Washington on February 8, which was attended by representatives of the Department of Justice,[8] the Bureau of Customs and the Post Office Department, to discuss possible changes in the procedure for handling material believed to be obscene. At that meeting it was decided to adopt a new procedure, intended to expedite the proceedings and to eliminate the question whether 19 C.F.R. 12.40 accords with 19 U.S.C.A. § 1305.[9] See also 19 U.S.C.A. §§ 1603 and 1604.[10] It was also decided to institute forfeiture proceedings against Exclusive, to seek a prompt disposition of that case, and to adopt new regulations shortly thereafter. The following day it was decided that forfeiture proceedings should also be instituted against International Nudist Sun No. 16 and Review International No. 6. A copy of each of the magazines was, therefore, referred to the United States Attorney in accordance with 19 U.S.C.A. § 1305.

On Friday, February 11, a libel was filed against the shipment of Exclusive, and the attachment and monition were posted by the United States Marshal on Tuesday, February 15. Also on February 15, libels were filed against the shipments of the other two magazines. The attachments and monitions as to them were posted on February 16. The magazines had been formally seized by Customs, see note 5 above, on February 11 at about the time the first libel was filed. Court orders directing that the Marshal, in addition to his monition in rem, publish notice of the seizures and of the forfeiture proceedings were signed on February 16 in the case of Exclusive and on February 17 in the case of the other two magazines.

Meanwhile, Customs had given notice of the libels to claimant, and claimant filed answers to all three libels on February 28. A meeting with the Court was held on March 4, a trial date was set, and the trial began on March 9. Testimony and other evidence were offered by both

---

7. Particularly United States v. 18 Packages of Magazines, N.D.Cal., 238 F.Supp. 846 (1964), and United States v. One Carton Positive Motion Picture Film, S.D.N.Y., 248 F.Supp. 373 (1965), and 247 F.Supp. 450 (1965).

8. Including an Assistant United States Attorney from Maryland.

9. See fn. 7 to United States v. One Book Entitled "The Adventures of Father Silas" et al., (S.D.N.Y., 249 F.Supp. 911, at 914 (1966).

10. 19 U.S.C.A. § 1603:
"Same [Seizure]; collector's reports
"Whenever a seizure of merchandise for violation of the customs laws is made, or a violation of the customs laws is discovered, and legal proceedings by the United States attorney in connection with such seizure or discovery are required, it shall be the duty of the collector or the principal local officer of the Customs Agency Service to report such seizure or violation to the United States attorney for the district in which such violation has occurred, or in which such seizure was made, and to include in such report a statement of all the facts and circumstances of the case within his knowledge, with the names of the witnesses and a citation to the statute or statutes believed to have been violated, and on which reliance may be had for forfeiture or conviction."
19 U.S.C.A. § 1604:
"Same, prosecution
"It shall be the duty of every United States attorney immediately to inquire into the facts of cases reported to him by collectors and the laws applicable thereto, and if it appears probable that any fine, penalty, or forfeiture has been incurred by reason of such violation, for the recovery of which the institution of proceedings in the United States district court is necessary, forthwith to cause the proper proceedings to be commenced and prosecuted, without delay, for the recovery of such fine, penalty, or forfeiture in such case provided, unless, upon inquiry and examination, such United States attorney decides that such proceedings cannot probably be sustained or that the ends of public justice do not require that they should be instituted or prosecuted, in which case he shall report the facts to the Secretary of the Treasury for his direction in the premises."

sides, and the case has been fully briefed and argued.

■ *Discussion of Procedure.* Section 1305 of Title 19, U.S.C.A., is set out in note 1, above. The predecessors of that section have been in the Code for a long time.[11] One which was substantially the same as the present section was held constitutional in United States v. One Obscene Book Entitled "Married Love", S.D.N.Y., 48 F.2d 821 (1931). The present section was held unconstitutional in United States v. 18 Packages of Magazines, N.D.Cal., 238 F.Supp. 846 (1964), but that decision was rendered before Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), wherein the Supreme Court stated that "a noncriminal process which requires the prior submission of a film to a censor avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system". 380 U.S. at 58, 85 S.Ct. at 738. The Court then summarized the necessary safeguards, as follows: (1) The burden of proof must rest on the censor; (2) no valid final restraint may be imposed except by judicial determination,[12] and any restraint prior to such determination must be designed to preserve the status quo; and (3) a prompt judicial determination must be assured. 380 U.S. at 58–59, 85 S.Ct. 734. In the year since *Freedman,* judges in the Southern District of New York have thrice refused to hold section 1305 unconstitutional on its face, but have required that it be applied in accordance with the tests set out in *Freedman.* See United States v. One Carton Positive Film, (McLean, J.) 248 F.Supp. 373 (1965), and (Graven, J.) 247 F.Supp. 450 (1965); United States v. One Book entitled "The Adventures of Father Silas", (Frankel, J.) 249 F.Supp. 911 (1966).

This Court agrees with the decision in each of those cases, and refers particularly to the excellent discussion of the legislative history in Section II of Judge Frankel's opinion.

■■ Customs admission procedures applicable to different types of publications must embody the safeguards specified in *Freedman.* Reasonable speed must be used to reach an administrative decision that a libel for forfeiture shall be filed, and a judicial determination of the issue of obscenity must be made with reasonable promptness. What is reasonable in the case of one type of publication, however, may not be reasonable with respect to another type. Some material is timely and loses much of its value if there is any substantial delay. Other material, such as that with which we are dealing in these cases, may be almost timeless. The instant cases present no such problems as are involved in the previous scheduling of motion pictures or the need of a student for a particular book.

The procedures condemned by Judge Frankel were established by Customs in an effort to reduce the number of forfeiture proceedings which would have to be brought in the courts, by encouraging administrative disposition before judicial proceedings are begun. Since it appears that those procedures result in unreasonable delays in many cases, the governmental agencies involved have wisely attempted to work out a more expeditious procedure.

■ The proposed new procedure, which was followed in these cases, meets the tests set out in *Freedman,* particularly when it is recognized that all publications, as well as all other goods which are imported into the United States, must be examined by Customs officials for many

11. Act of August 30, 1842, c. 270, § 28, 5 Stat. 566; Act of March 2, 1857, c. 63, 11 Stat. 168; Act of March 3, 1883, c. 121, §§ 2491–2493, 22 Stat. 489–490; Act of October 1, 1890, c. 1244, §§ 11–13, 26 Stat. 614–615; Act of August 27, 1894, c. 349, §§ 10–12, 28 Stat. 549; Act of

August 5, 1909, c. 6, §§ 9–11, 36 Stat. 86.

12. Citing A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

different purposes after they are entered and before they are cleared.[13] The evidence in this case indicates that the new procedures will continue to result in the release of the material with reasonable promptness after entry if either the line examiner or the appraiser passes it.[14] Even if the material is referred to the Obscene Literature Committee, its decision is usually rendered within two days. If the Committee decides to go forward, the matter must be taken up at once with the United States Attorney, who is required by statute immediately to inquire into the facts and forthwith to institute proceedings in the district court unless he decides that the proceedings probably could not be sustained or that the ends of justice do not require that they should be instituted and prosecuted. 19 U.S.C.A. § 1604. See note 10, above. Meanwhile, the material will have been seized and held by Customs to await the judgment of the district court, 19 U.S.C.A. § 1305, and the importer or his broker will have been notified of the seizure and libel. The seizure by Customs is in the nature of a detention of questionable material pending a judicial adjudication. Such restraint by detention is designed simply to preserve the status quo, i. e., to prevent entrance of the suspect material until the Court has ruled.[15] Negotia-

tions with Customs or the United States Attorney looking to a possible settlement of the matter may be conducted either before or after the Marshal serves the monition. An opportunity for such discussion was offered in this case. There is ordinarily no reason why the cases cannot be heard promptly by the court if the parties desire a prompt hearing and there is any real need for speed. In some instances the importer is more anxious to develop his case fully than to secure a prompt decision. The decision in the instant case was delayed because the opinions in Mishkin v. State of New York, 86 S.Ct. 958 (1966), A Book Named "John Cleland's Memoirs of a Woman of Pleasure" ("Fanny Hill"), et al. v. Attorney General of Com. of Massachusetts, 86 S.Ct. 975 (1966), and Ginzburg v. United States, 86 S.Ct. 969 (1966), were handed down by the Supreme Court while this opinion was being prepared, and counsel for claimant requested an opportunity to file a supplemental brief. In appropriate cases the material may be released pendente lite in accordance with the provisions of 19 C.F.R. 23.22. See also cases in 19 U.S.C.A. § 1605, n. 2 and n. 3.

■ *Conclusion re. Procedure.* This Court concludes that section 1305 of Title 19, U.S.C.A., is not unconstitutional on

13. A line examiner must keep in mind over fifty possible questions in connection with each shipment for which clearance is sought. See generally 19 U.S.C.A. chaps. 3 and 4, and 19 C.F.R., Parts 8, 9, 10, 11, 12, 13, 14.

14. The evidence shows that the line examiner usually examines the material the same day it is delivered to the Appraisers' Stores, but that since the line examiner in Baltimore who examines books and magazines also has other items in his line, there may on certain occasions be a delay of one or two days.

15. In United States v. One Carton Positive Motion Picture Film, 248 F.Supp. at 376–377, Judge McLean said:

"* * * To be sure, some initial determination by the customs officials is necessary as to which works are to be held for such a judicial determination. But this is inevitable. The district court cannot reasonably be ex-

pected to view each and every one of the thousands of books and pictures and other works which are imported into the United States, most of which, after all, are innocuous. Some screening procedure must be set up. To put this responsbility upon the customs officials is appropriate and in fact it is hard to see how else it could be handled, as a practical matter. But it is the court which makes the ultimate determination. There is no 'seizure' in a final sense unless the court so decides, after a trial by jury, if the claimant wants one. The 'seizure' by the customs authorities is merely a temporary detention."

Mr. Justice Brennan also has discussed the Customs procedure as an example of desirable judicial adjudication as opposed to administrative adjudication. See Manual Enterprises, Inc. v. Day, infra, 370 U.S. 478 at 514–516, 82 S.Ct. 1432, 8 L.Ed.2d 639. (1962)

its face and has not been applied unconstitutionally in these cases.

## Obscenity

*The Material.* The so-called "magazine" Exclusive is really a picture book containing 34 pictures of nude or almost nude women. In each picture the breasts and pubic area are fully exposed. In some of the pictures the women are wearing garter belts and silk stockings, which focus attention on the pubic area. In some of the pictures the models are posed in lewd attitudes and positions. In several pictures the women are chained to a chair and their wrists are bound.[16] The only written material is on the title page, in English and two foreign languages, and appears verbatim in other "magazines" published by Nordisk Bladcentral, of Copenhagen.[17]

International Nudist Sun No. 16 and Review International No. 6 each contain 20 posed pictures of well-developed nude men, with the focus in most instances on the penis, which is flagrantly displayed. Although posed in outdoor settings, in few of the pictures are the models engaging in any normal outdoor activities. The articles in both magazines are innocuous, dreary and puerile, and bear little relation to the illustrations.[18] No reference is made to the illustrations in any of the articles.

*Discussion.* On the issue of obscenity the controlling case is Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957), as elaborated and in one respect "adjusted" by Mishkin v. State of New York, 86 S.Ct. 958 (1966); A Book Named "John Cleland's Memoirs of A Woman of Pleasure" et al. v. Attorney General of Com. of Massachusetts (the Fanny Hill case), 86 S.Ct. 975 (1966); Ginzburg v. United States, 86 S.Ct. 969 (1966); Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962); and Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).

In the *Fanny Hill* case Mr. Justice Brennan said:

"We defined obscenity in *Roth* in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S., at 489 [77 S.Ct. 1304]. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of

---

16. The possible sado-masochistic appeal of any of the pictures in Exclusive is too slight to be of any importance on any of the questions in this case. In other cases such appeal may be of importance. See the authorities cited in the various opinions in Mishkin, 86 S.Ct. 958, and Ginzburg, 86 S.Ct. 969. United States v. Rees, D.Md., 193 F.Supp. 849, 852–855 (1961), illustrates the possible dangers inherent in such material.

17. It reads: "The international Art Magazine is published bi-monthly. Europe's most distinguished photographers have contributed the pictures used in this magazine which has been released by the publishers exclusively to furnish serious artists and persons interested in art, who have some difficulty to find living models, with suitable photographs to be used as substitute for drawing painting and sculpturing.—Therefore the magazine will

be sold only to adults who are seriousminded of problems of art and will look on our pictures solely from an aestitical (sic) point of view." The material belies the protestation.

18. In International Nudist Sun No. 16 the articles are: Prudery in Naturist Clubs; The Art of Correct Breathing; On Forming a Naturist Club; Leisure and Automation; Psycho-Analysis and Physical Health; Learn to Relax and Stay Young; Masculine Hygiene; If You Must Wear Clothes; and Shivers and Goose Pimples. In International Review No. 6 the articles are: Naturism in winter; Finer focusing; How far will you go for a good skin?; "Nudist Paradise" revisited; Flowers and trees of Christmas; News of nudists (sic); Odds and ends; Moving around; Glassless (sic) nudism; and Spoil yourself. The articles fill approximately onehalf of the pages of the two magazines.

sexual matters; and (c) the material is utterly without redeeming social value." 86 S.Ct. at 977.

*(a) Prurient Appeal.* Many books, magazines and pictures are directed to the general public, but some are designed for special groups, such as males, females, children, adolescent males, adolescent females, homosexuals,[19] and others.

In *Mishkin,* Mr. Justice Brennan, speaking for the Court, said:

"Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement of the *Roth* test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group. The reference to the 'average' or 'normal' person in *Roth,* 354 U.S., at 489–490 [77 S.Ct. 1304], does not foreclose this holding.[*]

[*] "See Manual Enterprises, Inc. v. Day, 370 U.S. 478, 482 [82 S.Ct. 1432] (opinion of Harlan, J.); Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.L.Rev. 5, 72–73 (1960).

"It is true that some of the material in Alberts v. State of California, decided with *Roth,* resembled the deviant material involved here. But no issue involving the obscenity of the material was before us in either case. 354 U.S., at 481, n. 8 [77 S.Ct. 1304]. The basic question for decision there was whether the publication and sale of obscenity, however defined, could be criminally punished in light of First Amendment guarantees. Our discussion of definition was not intended to develop all the nuances of a definition required by the constitutional guarantees.

In regard to the prurient-appeal requirement, the concept of the 'average' or 'normal' person was employed in *Roth* to serve the essentially negative purpose of expressing our rejection of

that aspect of the *Hicklin* test, Regina v. Hicklin, [1868] L.R. 3 Q.B. 360, that made the impact on the most susceptible person determinative. We adjust the prurient-appeal requirement to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probable recipient group; and since our holding requires that the recipient group be defined with more specificity than in terms of sexually immature persons,[**] it also avoids the

[**] "See generally, 1 American Handbook of Psychiatry (Arieti ed. 1959) 593–604, for a description of the pertinent types of deviant sexual groups.

inadequacy of the most-susceptible-person facet of the *Hicklin* test." 86 S.Ct. at 963.

In United States v. Klaw, 2 Cir., 350 F.2d 155 (1965), the government contended that the material appealed particularly to the prurient interest of sexual deviates and also had prurient appeal to the average man. The Court "[doubted] that any court would take judicial notice of the reaction that deviates—or the average man—might have to such stimuli" as were involved in that case. This court agrees that expert testimony is desirable, if not necessary, to show what reaction deviates would have to almost any type of stimulus. Whether expert testimony is necessary to prove the probable reaction of the average man to various stimuli depends upon the nature of the material. Some may be so esoteric as to require expert testimony; other stimuli, like the pictures of the women in the "magazine" Exclusive, are so elemental that the ordinary judge or juror should be able to recognize the nature of their appeal to the average man.

In the instant case both the government and the claimant offered expert tes-

19. The psychiatrists were in substantial agreement, based upon Kinsey, that about 4% of all males are exclusively homosexuals, and another 10% are "bisexual", more homosexual than heterosexual, but making a more or less satisfactory adaptation to normal life in the community, including marriage. There is also a group of occasional homosexuals, whose number is hard to estimate, perhaps as high as 18%, probably somewhat lower. Including these groups, nearly 37% of all males have one or more homosexual experiences after adolescence.

timony with respect to the probable effect of the magazines on various groups in the community. Dr. Manfred S. Guttmacher, Chief Medical Officer of the Supreme Bench of Baltimore City and Consultant to the American Law Institute in the preparation of the Model Penal Code, testified for the government. Dr. Jonas R. Rappaport, Medical Officer of the Circuit Court for Baltimore County and a member of the Governor's Commission to Study and Review the Criminal Laws, testified for claimant. Dr. Guttmacher's testimony was confined to the two magazines depicting male nudes.

█ The Court finds from all the evidence, including the testimony of the psychiatrists, that International Nudist Sun No. 16 and Review International No. 6 were in fact primarily designed for homosexual males and, to a lesser extent, adolescent males; that the pictures have very strong prurient appeal to almost all exclusively homosexual or bisexual males and some prurient appeal to a large percentage of latent homosexuals and some adolescent males; that to many female adolescents they would be shocking and rather frightening [20] but to a few might have such prurient appeal as to cause masturbation.[21]

█ The Court finds that the pictures in Exclusive would appeal to the prurient interest of the average male, and particularly to the prurient interest of the adolescent male. That was the dominant theme of the material.

*(b) Patent Offensiveness.* This brings us to the question whether the material so affronts contemporary community standards relating to the description or representation of sexual matters as to be patently offensive.[22]

█ The standards to be applied in customs cases should be national standards. United States v. One Carton, 247 F.Supp. at 464. See also Jacobellis, 378 U.S. at 195, 84 S.Ct. 1676; Manual Enterprises, 370 U.S. at 488, 82 S.Ct. 1432; United States v. Ginzburg, 3 Cir., 338 F. 2d 12, 14 (1964), affirmed sub nom. Ginzburg v. United States, supra.

The Court must first decide whether any evidence, and if so what evidence, may be admitted to prove contemporary community standards. This problem has been discussed in a number of recent cases, which have reached different conclusions.[23]

In Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed. 2d 205 (1959), concurring opinions re-

20. Which does not tend to prove prurient appeal, but may be considered on the question of whether the material goes so far beyond ordinary community standards as to be patently offensive.

21. Both psychiatrists agreed that women as a group are not stimulated sexually to the same degree as men by pictures, articles or verbal statements.

22. The test with respect to this element was worded as follows by Justice Brennan in the *Fanny Hill* case: "that * * * the material is patently offensive because its affronts contemporary community standards relating to the description or representation of sexual matters * * *". 86 S.Ct. at 977. In *Manual Enterprises*, Justice Harlan cited the test in the A.L.I. Model Penal Code, "if it goes substantially beyond customary limits or candor in description or representation of such matters". 370 U.S. at 486, 82 S.Ct. at 1436. Justice Harlan also stated: "It is only in the unusual instance where,

as here, the 'prurient interest' appeal of the material is found limited to a particular class of persons that occasion arises for a truly independent inquiry into the question whether or not the material is patently offensive." 370 U.S. at 486, 82 S.Ct. at 1436.

23. United States v. Ginzburg, 3 Cir., 338 F.2d 12 (1964), aff'd 86 S.Ct. 958 (March 21, 1966); Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204 (1961); United States v. Hochman, E.D.Wisc., 175 F.Supp. 881 (1959), aff'd 7 Cir., 277 F. 2d 631, cert. den. 364 U.S. 837, 81 S.Ct. 70, 5 L.Ed.2d 61 (1960); United States v. West Coast News Company, Inc., W.D. Mich., 228 F.Supp. 171 (1964); Monfred v. State of Maryland, 226 Md. 312, 173 A.2d 173 (1961); Yudkin v. State of Maryland, 229 Md. 223, 182 A.2d 798 (1962); People v. Finklestein, 11 N.Y. 2d 300, 229 N.Y.S.2d 367, 183 N.E.2d 661 (1962); In re Harris, 56 Cal.2d 879, 16 Cal.Rptr. 889, 366 P.2d 305 (1961).

ferred to defendant's rights "to enlighten the judgment of the tribunal, be it the jury or as in this case the judge, regarding the prevailing literary and moral community standards and to do so through qualified experts," and that to "exclude such expert testimony is in effect to exclude as irrelevant evidence that goes to the very essence of the defense and therefore to the constitutional safeguards of due process." 361 U.S. at 164–165, 80 S.Ct. at 225. The A.L.I. Model Penal Code, section 251.4, Obscenity, p. 239, proposes that: "Expert testimony and testimony of the author, creator, publisher or other person from whom the material originated, relating to factors entering into the determination of the issue of obscenity, shall be admissible." In the instant case no expert testimony with respect to community standards was offered by either side, nor was there any testimony from the author, creator, publisher or other person from which the material originated.

Claimant did offer three types of evidence: (1) publications which have been held not obscene in certain court trials; (2) publications admitted by Customs officials in Baltimore shortly before and shortly after February 7, 1966; and (3) publications purchased by a former policeman at certain stores or newsstands in Baltimore during the trial. All of this evidence was admitted subject to exception over the objection of the government.

▮▮▮ (1) Claimant offered in evidence the items which were held not obscene in Sunshine Book Co. v. Summerfield, 101 U.S.App.D.C. 358, 249 F.2d 114 (1957), 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352 (1958), in One, Inc. v. Oleson, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 (1958), and in two nisi prius cases [24] decided before *Mishkin, Ginzburg* and *Fanny Hill*. Material involved in adjudicated cases, whether held obscene or not obscene, should always be considered by the Court as illuminating the opin-

ions rendered in those cases, and the items offered have been so considered here. Whether such material would ordinarily be admitted as evidence in a jury trial or in a trial before the court without a jury need not be decided; various factors would enter into such a ruling in each case. Since this is a test case, the Court has considered the books as evidence. This Court finds that the publications in the present case are more offensive than the material in *Sunshine Book* and *One, Inc.* The material approved in the two nisi prius cases is inconclusive, and entitled to little weight.

(2) It is not necessary to decide whether the material which was passed by Customs authorities in Baltimore shortly before or after the material was seized in the instant cases would ordinarily be admissible to prove the national standard. It would never be conclusive, and would ordinarily have little weight. The Supreme Court has insisted that the standard be determined in a judicial proceeding by the court or the jury, with such expert or other evidence as may be appropriate in the particular case. The problem before the Customs officials is a difficult one, complicated not only by the difficulty of interpreting the applicable Supreme Court decisions, but also by recent nisi prius decisions questioning the Customs procedures, which have been discussed above. The Customs officials decided to proceed against the magazines involved in these consolidated cases and to pass certain others. However, both before and after the decisions in *Mishkin*, the Customs officials in Baltimore have filed additional libels involving thousands of copies of other magazines.

In this case the Court has examined all the publications offered in evidence by claimant. Many of the pictures of male nudes in the magazines which have been admitted are generally similar to the pictures in International Nudist Sun No. 16 and Review International No. 6, but they were admitted before the decision

24. Royal News Co. v. Dewey Schultz, E.D. Mich., 230 F.Supp. 641, and Commonwealth of Pennsylvania v. Platt, Allegheny County Court of Quarter Sessions of the Peace, #379, December term, 1964.

of the Supreme Court in *Mishkin,* clarifying the question of prurient appeal to a particular group. Few of the pictures of female nudes or partly dressed females in the magazines admitted come close to the offensiveness of many pictures in Exclusive.

 (3) Claimant offered the testimony of a former City policeman, now a private detective, and the magazines he had purchased at a dozen stores or newsstands in the City during the trial and before the decision in *Mishkin.* He had started in "the Block" area and had proceeded to particular stores and newsstands which he and many other Baltimoreans know deal in pornographic material. His testimony indicates that such material is not available at respectable book stores, drug stores, newsstands or other outlets for magazines. It is noteworthy that on the very day this case was argued the proprietor of one of the stores where the detective purchased a magazine was convicted and sentenced to prison in the Criminal Court of Baltimore for selling obscene photographs of nude males.[25] Four of the outlets where the detective purchased magazines were located on "the Block" or adjacent thereto. The standards of "the Block" are not the standards to be applied in this case, any more than the standards of the most straight-laced persons. Material purchased in such specialized outlets has little or no value in determining contemporary community standards. Ginzburg v. United States, 86 S.Ct. 969 (1966). Nevertheless, the Court has considered the material purchased by the detective.

None of the opinions in *Mishkin, Ginzburg* or *Fanny Hill* discussed at length the question of patent offensiveness. In *Manual Enterprises* there was no majority opinion, but Justice Harlan, speaking for himself and Justice Stewart, included a description of the material in a footnote to his opinion, 370 U.S. at 489, fn. 13, 82 S.Ct. at 1438, and said:

"* * * Our own independent examination of the magazines leads us to conclude that the most that can be said of them is that they are dismally unpleasant, uncouth, and tawdry. But this is not enough to make them 'obscene.' Divorced from their 'prurient interest' appeal to the unfortunate persons whose patronage they were aimed at capturing (a separate issue), these portrayals of the male nude cannot fairly be regarded as more objectionable than many portrayals of the female nude that society tolerates. Of course not every portrayal of male or female nudity is obscene. See Parmelee v. United States, 72 App.D.C. 203, 206–208, 113 F.2d 729, 732–734; Sunshine Book Co. v. Summerfield, 355 U.S. 372 [78 S.Ct. 365]; Mounce v. United States, 355 U.S. 180 [78 S.Ct. 267, 2 L.Ed.2d 187]. Were we to hold that these magazines, although they do not transcend the prevailing bounds of decency, may be denied access to the mails by such undifferentiated legislation as that before us, we would be ignoring the admonition that 'the door * * * into this area [the First Amendment] cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests' (footnote omitted). Roth [354 U.S.], at 488 [77 S.Ct. 1304]." 370 U.S. at 489–491, 82 S.Ct. at 1438–1439.

The other Justices, comprising the majority, did not discuss this aspect of the case.

As we have seen, in *Mishkin* a majority of the Court held for the first time that "Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement of the *Roth* test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group." 86 S.Ct. at 963. But

---

25. The Court examined those photographs and found them more offensive than the photographs of nude males involved in this case.

*Mishkin* did not discuss the "patently of-fensive" element of the test.

■ This Court must decide, in the light of those and other opinions, whether the magazines involved in this case are patently offensive. It is clear that the representation of male or female nudity is not per se offensive. Museums display paintings, prints and statues of nudes. Many books, especially classics, sold gen-erally to the public, are illustrated with pictures of nude men and woman. It is also clear that nude men or women or both may be shown in such positions, poses and settings as to be patently of-fensive.

■ *Exclusive.* The Court is satis-fied that the pictures which comprise the magazine Exclusive are patently offen-sive.

International Nudist Sun No. 16 and Review International No. 6. In most of the photographs of nude men in those magazines, the models are not engaged in any normal activity, but are so posed as to highlight the genitalia, which are flagrantly displayed.[26] On the other hand, the few pictures in which two men are shown do not directly suggest homo-sexual activity, unless there are some esoteric ritual positions of which the Court is not advised. The text, although evidently intended to support an argu-ment that the magazines are "sunbathing and nature living" publications, is clear-ly secondary to the pictures, which are not referred to therein, and no one, how-ever moronic, would pay a high price for the innocuous written material.

In the light of the Supreme Court cas-es, these two magazines must be regarded as borderline material. The format and contents of the magazines and their high price show that they are designed and imported primarily for sale to homosex-uals. It is evident that the commercial importers and distributors of nude pic-tures and similar material have been

pressing further and further beyond the material previously approved by most courts, particularly the Supreme Court, and nearer to or beyond the legal limits, as defined by the Supreme Court. This Court finds as a fact that most people in the United States would consider the magazines to be patently offensive.

The difficult question is whether, in the light of the Supreme Court opinions, the people may be protected from the ef-fect which the importation of such mate-rial is likely to have in pushing some of the millions of latent homosexuals over the line, with all the attendant misery and problems, and in defeating the ef-forts of some of the millions of "bisexu-al" males to preserve the precarious ad-justment they have made. Until the binding authorities are clarified, this Court concludes that the decisions do not prevent it from holding that the ma-terial is patently offensive.

■ *(c) Social Importance.* The third element of the obscenity test is that the material be utterly without social importance or value. *Roth*, 354 U.S. at 484, 77 S.Ct. 1304; *Jacobellis*, 378 U.S. at 191, 84 S.Ct. 1676; *The "Fanny Hill" case*, 86 S.Ct. 975.

■ Exclusive contains no text. The statement on the title page that it "has been released by the publishers exclu-sively to furnish serious artists and per-sons interested in art, who have some difficulty to find living models, with suitable photographs to be used as sub-stitute for drawing painting and sculp-turing," is plainly a subterfuge. The same statement appears verbatim on the title pages of the other "magazines" published by Nordisk Bladcentral, offer-ed in evidence by claimant, imported recently or purchased at the outlets de-scribed above. The publication is utter-ly without social importance or value.

International Nudist Sun No. 16 and Review International No. 6. Each claims,

---

26. In this respect they differ from the illustrations in the bona fide nudist maga-zines considered by the Supreme Court in *Sunshine Books*. The nudes shown in

those pictures were for the most part engaged in sports and other normal out-door activities, and the focus was not on the genitalia.

in identical material on the title page, to be "the international sunbathing and nature-living monthly magazine". As noted above however, in the discussion of patent offensiveness, the text, although innocuous and evidently intended to support this contention, is so clearly secondary to the pictures that it may be disregarded. It can have no part in selling the magazines to anyone. The text has no literary significance or social value, and the pictures, which are in essence the magazine, are utterly without any artistic significance or other redeeming social value.

*Conclusion re. Obscenity.* The Court concludes that the magazines Exclusive, International Nudist Sun No. 16 and Review International No. 6 are obscene within the purview of section 305 of the Tariff Act, 19 U.S.C.A. § 1305.

\*

The Court will enter an appropriate judgment order.