UNITED STATES of America,
Appellee,

v.

Potomac News Co., Claimant, of 56 CAR-
TONS CONTAINING 19,500 COPIES
OF a MAGAZINE ENTITLED "HEL-
LENIC SUN," Appellant.

No. 10798.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 31, 1966.

Decided Feb. 16, 1967.

Stanley M. Dietz, Washington, D. C., for appellant.

Fred Kelly Grant, Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., and Arthur G. Murphy, First Asst. U. S. Atty., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and CRAVEN, Circuit Judges.

HAYNSWORTH, Chief Judge:

An importer of an undated magazine devoted to pictures of male nudes has appealed from a judgment ordering the destruction of the magazines as obscene. He contests the constitutionality of the

statute authorizing their seizure, the procedures in the Bureau of Customs and those in the District Court and the finding that the magazines were without socially redeeming value. We find no merit in any of the positions taken.

Fifty-six cartons containing 19,500 copies of "Hellenic Sun Number Two" arrived in Baltimore from Denmark, consigned to customhouse brokers on behalf of Potomac News Company. They were entered on Friday, March 4, 1966, and were delivered by a contract drayman to the Appraisers' Storehouse of the Bureau of Customs in Baltimore on Thursday, March 10. They were examined successively by "verifiers," the line examiner and by the Assistant Collector of Customs at Baltimore, who referred them to the United States District Attorney in Baltimore on March 16. They were "seized" on that day, and the importer was notified of it on March 17. On March 18, 1966, the District Attorney filed a libel, and later, on the same day, the importer, whose attorney had conferred with the line examiner, filed a suit for an injunction.

The two cases were consolidated for trial. A hearing was held on April 1, 1966, and the District Court filed its opinion on April 5 and its formal judgment on April 14, 1966.

# I

## PRIOR RESTRAINT

█ The importer attacks the constitutionality of the governing statute, 19 U.S.C.A. § 1305, contending that it imposes a prior restraint upon the dissemination of literature in violation of the First Amendment. This contention was rejected by the District Court largely for the reasons which the District Judge had expressed at some length one day earlier in its opinion in United States v. 392 Copies of a Magazine Entitled "Exclusive," D.C.Md., 253 F.Supp. 485. There is very little that we can add to that discussion as supplemented

by the District Court in its opinion in this case,[1] except to say that the statutory scheme appears to us to comply fully with the requirements of Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, as the District Court held, and to note the affirmance by the Second Circuit of one of the cases upon which the District Court relied. United States v. One Carton Positive Motion Picture Film entitled "491," 2 Cir., 367 F.2d 889. The Court of Appeals for the Second Circuit thoroughly canvassed the question in the "491" case. We agree with what was said by the Second Circuit in "491" and by the District Judge in the two cases decided by him last April.

# II

## PROCEDURAL DELAY

Viewed in its entirety, it cannot be said that there was any unreasonable delay. From March 4, 1966, when the cartons were entered, until April 5, 1966, when the District Court filed its formal opinion, or until April 14, 1966, when a formal order in conformity with the opinion was filed, the administrative procedures and the judicial proceedings, together, required little more than a month for a final judicial determination in the District Court of the question of obscenity, including the resolution of the related constitutional questions.

The answer could not have been had in so short a time had not the matter received the prompt attention of the District Court and had it not given the case great preferential treatment through the scheduling and conduct of the hearing to the filing of an opinion and the entry of the formal judgment.

Still, the importer complains of delay in the Bureau of Customs, focusing particularly on the delay from March 4, 1966, when the cartons were entered, until March 10 when they were received at the Appraisers' Storehouse. This delay of four business days, for it straddled

---

1. United States v. 56 Cartons Containing 19,500 Copies of a Magazine Entitled

"Hellenic Sun," D.C.Md., 253 F.Supp. 498.

a weekend, was due to some neglect or mistake of the contract drayman, though the District Court found that in no other instance had any delay of so long a time been attributable to the drayman.

We agree with the District Court that the Bureau of Customs is responsible for its contract draymen, and if one does not give the service that is required for the prompt processing of such materials, the Bureau of Customs must resort to other draymen or to other means to procure the drayage. It is equally true, however, that every neglect resulting in a few days' delay does not abort the entire proceedings, if the procedures in the usual case are not infected with such delays and if, in the particular case, the total elapsed time required for the administrative procedures, after deleting periods of delay attributable to the importer, is not unreasonably great.

Here these materials were sent to the United States Attorney on March 16, only twelve days after their entry. While dated material of short-lived appeal or usefulness may require even more expeditious procedures, the total elapsed time from entry to the administrative determination seems sufficiently short, bearing in mind the many other questions which customs officials must resolve in clearing incoming shipments.[2]

In the "491" case, the period required for administrative action, without regard to the period of delay attributable to the importer, was much longer. That case involved a motion picture film intended for commercial distribution, material which usually requires more expeditious handling than undated magazines containing pictures of undressed males, which are likely to have as much, or as little, demand six months or a year hence as they do now. But the nature of the question must also be considered, for there was a serious question as to whether the film, "491," was obscene in light of its claim to social sig-

nificance. This is demonstrated by the division among the Judges of the Second Circuit on that question, and officials of the Bureau of Customs cannot be expected to reach a final administrative determination that such materials should be submitted to the District Attorney as easily or as quickly as they should decide to submit materials such as these. Twelve days is not a long time for the conclusion of all customs procedures respecting the admission of undated picture magazines and the submission of the question to the District Attorney.

We conclude that the statute contains assurance of a prompt judicial determination of the obscenity question, and that the importer clearly received it in this instance.

### III

### PROCEDURES IN THE DISTRICT COURT

Contrasting with his complaint of delay in the Bureau of Customs, the importer complains that the proceedings in the District Court moved too rapidly and with insufficient notice to him. He asserts a denial of a right to trial by jury in violation of the Seventh Amendment and denial of the right of trial in violation of the Fifth.

After the Government filed its libel on March 18, 1966, and the importer its complaint, the importer answered the libel raising the questions of the constitutionality of § 1305, facially and as applied, and denying that the magazines were obscene. It also filed a motion to dismiss, raising substantially the same questions. Conversely, the Government filed an answer and a motion to dismiss the importer's complaint seeking injunctive relief.

The importer now asserts that it was under the impression that the hearing held on April 1, 1966 was limited to the disposition of the motions to dismiss. Had it understood that there

---

2. See, United States v. 392 Copies of Magazine Entitled "Exclusive," D.C.Md., 253 F.Supp. 485, fn. 13 and accompanying text.

was going to be a trial on the merits, it asserts, it might have arranged for the presence of expert witnesses who would have been of assistance to it on the issue of obscenity. It might also have demanded a jury trial, for though it recognizes that the Government proceeding was in rem, § 1305 contemplates a jury trial of the question of obscenity when one is demanded. We need not consider the question of the right, under these circumstances to a trial by jury of the obscenity issue, for we think the record clearly shows that there was a trial on the merits to the Court, by consent, on April 1, 1966.

At the opening of the hearing on April 1, the Court made reference to the fact that there were two separate cases and to the pleadings which had been filed in each. It inquired if counsel wished to "dispose of everything today," to which the attorney for the importer responded that he saw no reason why they should not. At that time the lawyer might have been thinking of the two motions to dismiss in the two separate cases consolidated for the hearing, but, thereafter, there was reference to a stipulation of facts which reserved the right of both parties to offer additional testimony, and the Court inquired about the importer's damage claim in its complaint. Counsel disclaimed any reliance upon the damage claim, whereupon the Court expressed the opinion that the damage issue could not be disposed of that day, but, if that claim was not being seriously asserted, it appeared essentially a case for an injunction.

Thereafter the Government proceeded to offer witnesses. A psychiatrist testified at some length regarding the prurient appeal of the magazine and the class of persons who would find it titillating. Two officers of the Bureau of Customs also testified. These witnesses were cross-examined extensively by the lawyer for the importer with no objection and without the slightest suggestion that he was not prepared for a full trial on the merits that day. At the conclusion of the trial, he referred to his efforts to rush the proceedings to a conclusion, his interest in the Court's decision and the effect the guidelines which the Court would lay down would have upon the subsequent importation of similar magazines. Even when the importer's lawyer had received a copy of the District Court's opinion on the merits and a proposed formal order was submitted to him for his approval of its form, he voiced no objection; the first reference to this contention is in his brief in this Court.

■■ If it could be said, therefore, that the lawyer might have been under some misapprehension when the proceedings opened that the Court was going to hear that day only the legal issues arising out of the motions to dismiss, that impression could not have survived the subsequent colloquies between Court and counsel. Surely, when the Government offered all of its evidence on the merits and the lawyer for the importer thoroughly cross-examined the Government's witnesses, he could not then have been under the impression that the hearing on the merits was reserved for a later date. If he had initially been under the impression that the hearing on April 1 would be restricted to the issues arising out of the motions to dismiss, it became incumbent upon him, when it became perfectly apparent that the trial on the merits was being had, to protest and inform the Court that he was not prepared for the presentation of his case on the merits on that day. After full participation in the trial without any suggestion of any earlier misapprehension, with no request for a continuance or for an opportunity to offer additional testimony at a later date, the importer is no longer in a position to assert any misunderstanding under which it may have labored in the opening moments of the proceedings. When it became unmistakably apparent that the proceedings were a trial on the merits, the importer could not silently acquiesce in a submission of all the issues, reserving the right when the judgment went against him to assert any

earlier misapprehension about the extent of the hearing to be conducted on April 1.

▆ We conclude, therefore, there was no violation of any of the importer's Fifth Amendment rights, for a full trial was afforded him on April 1, 1966. Nor was there any denial of a Seventh Amendment right to a jury trial of the obscenity issue, for there was no demand for a jury. On the contrary, there was clearly a cooperative attempt by the Court and by counsel for both parties to attain a full submission of all issues to the Court as early as practicable and a prompt resolution of them by the Court. Procedurally, the importer received from the Court exactly what it sought.

## IV

### OBSCENITY

The magazine "Hellenic Sun Number Two" is a collection of photographs of undressed men. Some are in color. There is one of a group of boys. They are posed in the out-of-doors, but the generally languid models are not engaged in outdoor activity. In the composition of the photographs, the genitals of the models are made the focal points of the pictures. The camera's interest is languished upon the penis, and, if the general pose of each model be languid, the penis in some of the pictures appears not in complete repose.

The pictures have no apparent artistic value. They have no semblance of the qualities of Michelangelo's David. Raw in the extreme, and with no redeeming attribute, the normal male, if Dr. Kinsey will permit us to retain a belief there is such a thing, can view them only with revulsion.

The late Dr. Manfred A. Guttmacher, the well-known psychiatrist of Baltimore, was a witness for the government. He testified that the pictures would have a prurient appeal for a large proportion of male homosexuals, particularly juvenile males with homosexual tendencies. The one picture of the boys would have a prurient appeal for paedophiles. Adolescent girls would find them frightening as well as shocking, but with some exceptions, mature women would find little stimulation in such material.

Other evidence was introduced which indicated that the importer intended to distribute the magazine among male homosexuals. They cost the importer approximately 24 cents each, but it expected to sell them to members of that deviant sexual group for a very substantial $5.00 a copy.

▆ On this showing and for the reasons carefully discussed by the District Court, we unhesitatingly affirm its conclusion that these magazines are obscene. An examination of the material, reinforced by the evidence of its prurient appeal to homosexuals[3] and of the importer's promotional material for the exploitation of that deviant group,[4] leads inescapably to that conclusion.[5]

In this Court, the importer attacks the finding of obscenity on two grounds which require mention.

▆ First, it is said, that this is a homosexual nudist magazine; if nudist magazines may be circulated among heterosexual people,[6] nudist magazines featuring and appealing to homosexuals may not be suppressed by heterosexual censors, even judicial ones. The argument's premise has no foundation, however, for pictures of females as obscene-

3. See Mishkin v. State of New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56.

4. See Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31.

5. See, also, Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793;

Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639; Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

6. See Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352.

ly displayed, intended for circulation among heterosexual males, are equally suppressible.[7] *Mishkin,* of course, forecloses any contention that the material may not be held obscene because it has prurient appeal only to "a clearly defined deviant sexual group."

 Next, it is said, that a finding of obscenity is foreclosed by the presence of three "dreary and puerile"[8] articles dealing, generally, with nudism. The articles are inoffensive in themselves, and they are not wholly unrelated to pictures of naked men in outdoor settings. The insertion of innocuous material, however, cannot cloak pornography with immunity or obscure the fact that the magazine was designed and intended for the commercial exploitation of the prurient interest of male homosexuals. Fillers do not change the character of the publication or lend to it, as a whole, a redeeming social value to which it has no other claim.

This magazine is no "Memoirs of a Woman of Pleasure," which has some claim to literary merit.[9] It is no "491," which has some claim of a serious, albeit realistic, contribution to the problem of juvenile delinquents and their treatment.[10] Viewed as a whole, with its article fillers, it is a picture magazine appealing to the prurient interest of homosexuals, intended to stimulate that interest and having no substantial potential market outside that deviant group.[11]

We find no merit in any of the contentions made on appeal.

Affirmed.

7. See our opinion in the *Exclusive* case, decided this day. United States v. Claimant of 392 Copies of a Magazine Entitled "Exclusive," 4 Cir., 373 F.2d 633.

8. The District Judge's description of similar material in the *Exclusive* case.

9. See A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1.

10. See United States v. One Carton Positive Motion Picture Film Entitled "491," 2 Cir., 367 F.2d 889.

11. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, requires us to look at the magazine as a whole. The insertion of the innocuous articles into this picture magazine achieves no alteration of the view. It is still a collection of pictures of naked men with an excessive interest in the genitalia and excessive accent upon them.